Argued October 20; affirmed December 30, 1948

# FULLERTON *v.* CENTRAL LINCOLN PEOPLE'S UTILITY DISTRICT ET AL.

201 P. (2d) 524

*Gus J. Solomon* and *Raymond M. Kell,* both of Portland, argued the cause for appellants. With them on the brief was G. K. Litchfield, of Newport.

*Stanley R. Darling,* of Eugene, argued the cause for respondent. On the brief were Darling & Vonderheit, of Eugene.

Before ROSSMAN, Chief Justice, and LUSK, BELT, KELLY, BAILEY and HAY, Justices.

HAY, J.

Defendants are, respectively, a municipal corporation organized and existing under and by virtue of the

People's Utility District Law (sections 114-201 through 114-269, O. C. L. A.) and its board of directors. The defendant directors have adopted an ordinance undertaking to authorize the issuance and sale of $200,000 in revenue bonds of the district, without first having secured the approval of the qualified voters thereof. Plaintiff, a taxpayer and qualified voter of the district, brought this suit, claiming that such ordinance is illegal and invalid, and praying for a declaratory judgment to that effect. A general demurrer by defendants to plaintiff's complaint was overruled, and, defendants refusing to plead further, the circuit court entered a decree in accordance with the prayer of the complaint. Defendants have appealed to this court.

By the attacked ordinance, the defendant directors, deeming it necessary and advisable to issue and sell revenue bonds in order to provide funds for the development of the district's electric system by making betterments and improvements thereto and extensions thereof, undertook to authorize the issuance and sale of revenue bonds in the aggregate principal amount of $200,000, payable from and secured by the revenues to be derived by the district from its operations, after payment therefrom of all expenses of operation and maintenance, including taxes. The issuance and sale of such bonds has not been approved by vote of the qualified voters of the district.

The legislature has invested people's utility districts with certain powers, among which are the following:

"(6) To borrow money and incur indebtedness, subject to the conditions hereinafter provided, to issue, sell and assume evidence of indebtedness, and to refund and retire any indebtedness that may exist against or be assumed by the district or that

may exist against the revenues of such district; provided, that no indebtedness shall be incurred by the board of directors exceeding the ordinary annual income and revenue of the district without the approval of the qualified voters, as hereinafter provided for; to pledge any part of its revenues; provided that no indebtedness shall be incurred or assumed, except such as shall be incurred or assumed on account of the development, purchase and/or operation of a utility as defined in this act."

Section 114-245, O. C. L. A., as amended by Ch. 287, Or. L., 1941, and Ch. 205, Or. L., 1945.

"(1) For the purpose of carrying into effect the powers herein granted, any district, when authorized by a majority of the qualified voters of such district, voting at any general primary or general election or at a special election, at which special election not less than twenty-five per cent of the registered voters within the district shall have voted on the question, may issue and sell revenue bonds . . ."

Section 114-255, O. C. L. A., as amended by Ch. 287, Or. L., 1941.

"Before any district shall issue any general obligation or any revenue bonds, the question whether such bonds of said district shall be issued shall be submitted to the qualified voters of the district, either at any general, state or county election or at a special election called for that purpose by the board of said district. Notice of such election shall be given as herein provided. At such election the ballots shall contain a statement of the amount of bonds to be voted on and the purpose for which such bonds are to be used. If a majority of those voting on the question vote 'yes', provided the voters have voted on the question as in this act provided, the board of directors of said district shall be authorized and empowered to issue bonds

of the character and in the amount designated by such ballot at said election, otherwise not.''

Section 114-256, O. C. L. A.

The ordinary annual gross income and revenue of the district is in excess of $480,000, and the ordinary annual net income thereof does not exceed $120,000.

Two questions are presented upon this appeal. The first is as to the meaning which the legislature intended to be attributed to the phrase ''ordinary annual income and revenue'', as used in the statute.

The word ''income'' is capable of a variety of meanings, depending upon the manner of its use. The ordinary meaning, without qualification, is as follows:

" 'Income' means that which comes into or is received from any business or investment of capital, without reference to the outgoing expenditures. The term, when applied to the affairs of individuals, expresses the same idea that 'revenue' does when applied to the affairs of a nation.'' 4 Words & Phrases, 3504. Quoted with approval in Eaid v. National Casualty Co., 122 Or. 547, 556, 295 P. 902.

The Eaid case was an action upon a casualty insurance policy. One of the defenses was that, in his application for insurance, the plaintiff had stated that his monthly income exceeded the monthly indemnity applied for by at least twenty-five per cent, whereas in fact it was no more than sufficient in amount to defray the expenses of his business. Upon this point, the court held:

". . . While the word 'income' is sometimes used synonymously with the word 'profits', it is clearly apparent that in the application of plaintiff the word was used to denote the amount received by him in his occupation in order to approximate

the loss which he would sustain by reason of being incapacitated from pursuing his usual vocation. The point is not well taken."

"Income, in its usual acceptation, is a loose and vague term; it applies equally to gross receipts and to net produce; But when the Legislature had limited it to be synonimous [sic] with profits and gains, it became as clear and precise as any other word." Dryden: 1802, Med. Jrnl., VIII, 229, quoted in Oxford Eng. Dict., under "Income".

"Revenue" is the term generally used in referring to the income of a government or governmental subdivision, and, as so used, means "all public moneys which the state collects and receives, from whatever source and in whatever manner." Black's Law Dict., 3 ed., p. 1553. Another meaning is: "That which returns, or comes back, from an investment; the annual or periodical rents, profits, interest, or issues of any species of property, real or personal; income." Webster's New International Dict; Merriam, 1926.

It is contended that, as used in the People's Utility District law, the words "ordinary income and revenue" should be construed to mean gross income and revenue, without any deduction for expenses of operation. We find nothing in the language of the act to sustain this contention.

From what counsel call the historical meaning of the phrase under consideration, as including and generally meaning income derived from any source and not that derived from taxes alone, they seek to draw an analogy which would give to it the meaning of "gross income and revenue". We are unable to find any such analogy as applicable to the question before us. Gross revenue, irrespective of the amount of expenses or other necessary outgo to which such revenue

may be required to be appropriated, is obviously not a reasonable rule or standard by which the credit of a municipality is to be measured. Some priority must be recognized for those expenses of the municipal corporation which are essential to its existence and to the performance of its functions. 1 Dillon, Municipal Corporations, 5 ed., section 210.

Supposed "advantages" are pointed out, which, it is contended, will follow from construing the statute so as to relate to gross revenue rather than to net revenue the maximum indebtedness that may be incurred by the district without approval by the voters. Such claimed advantages are (1) the amount of money that may be raised under such statutory construction may be easily ascertained and will be comparatively constant, and (2) such amount will be sufficient to insure adequate borrowing power to meet all emergencies. We think that, (1) if gross revenue may be "easily ascertained"—which means, we assume, estimated in advance—net revenue may be estimated just as easily, and (2) it is not apparent that the legislature intended to give to the directors unbridled authority to exercise a borrowing power adequate to meet all emergencies. Provisions granting power to a municipal corporation to contract indebtedness without approval of the voters are usually related to the amount of income which may reasonably be anticipated to remain in the treasury of the corporation out of its income after payment of its ordinary expenses and special commitments. This is logical, as the amount of gross income does not necessarily have any relation whatever to the corporation's ability to meet unbudgeted items of expenditure.

In *Fisher v. City of Bartlett* (Tex. Civ. App.) 76 S. W. 2d 535, the court construed the word "revenues",

as used in a trust deed hypothecating the revenues of a municipal light plant and the plant itself to the payment of bonds issued by the city to provide funds for the erection of the plant. It was contended that the trust deed imposed pecuniary obligations in excess of the net revenues of the plant, which might become a charge upon the general revenues of the city derived from taxation. In rejecting this contention, the court held that the word "revenues", as used in the trust deed, would be presumed to mean "net revenues", where such construction was necessary to preserve the evident intention of the city authorities to secure the bonds only by mortgage upon the plant and its revenues, and not to impose any general pecuniary liability upon the city.

In *State ex rel. Miller v. State Board of Education*, 56 Ida. 210, 52 P. 2d 141, the income of certain buildings had been pledged in support of a bond issue, and a question to. be determined was whether gross income or net income was intended. The court said, in part:

". . . The 'income' to be pledged must necessarily mean net income; otherwise it would amount to incurring a *state liability*, for the reason that if the entire *gross receipts* from the operation of the proposed building as well as Lindley Hall can be hypothecated for the payment of such bond issue, it will entail the use of state funds or subsequent state appropriations in considerable sums to defray the overhead and operating expenses. On the other hand, the act (Laws 1935, 1st Ex. Sess., c. 55, § 10) declares: 'Such bonds shall not constitute a debt, legal or moral, of the State of Idaho, shall so recite on their face, and shall not be enforceable against the State, nor shall payment thereof be enforceable out of any funds of the institution issuing said bonds other than the income and revenues pledged

and assigned to, or in trust for the benefit of, the holder or holders of such bonds.'

"Furthermore, the word 'income', in common parlance, is generally understood as 'gain or profit' (Webster's New International Dictionary; In re Redding [1897] 1 Ch. 876, 879; Lawless v. Sullivan, [1881] 6 A. C. 373, 378), and it was evidently not thought by the Legislature to mean *gross receipts*. To so hold would run counter to the declared purpose of the act to create *no 'legal or moral' obligation against the state.*"

See also *Public Service Comm. v. City of Helena,* 52 Mont. 527, 159 P. 24, in which the court was concerned with the construction of the word "revenues", as used in a statute authorizing the pledging of revenues to discharge the indebtedness of a municipal waterworks. The court held that the word meant net revenues, or gross receipts less necessary operating expenses.

■ The purpose of the legislature in limiting the authority of the directors of a people's utility district to borrow money without previous approval of the legal voters must have included the intention to require the directors to conduct the affairs of the district upon a pay-as-you-go basis. Cf. McQuillin, Municipal Corporations, 2 ed., Rev. vol. 6, section 2365, p. 10. This is indicated by the limitation that the directors may not incur, without voter approval, any indebtedness exceeding the amount of the ordinary *annual* income and revenue of the district. "It is provided by the constitutions or statutes of some of the states that no debt, over and above current income and revenues, can be created or bonds issued as evidence of an indebtedness, unless the same be approved by the voters of the municipality at an election for that purpose. The purpose served by such provisions is to require munici-

palities to carry on their corporate operations upon a cash basis. The revenues and income for each year must pay the expenditures for such year, and if they should run behind in any one year the deficiency can not be paid from taxes collected in a subsequent year.'' 1 Jones, Bonds and Bond Securities, 4 ed., section 82.

In *Public Market Co. v. Portland,* 171 Or. 522, 130 P. 2d 624, 138 P. 2d 916, this court had under consideration the meaning of a section of the charter of the city of Portland which reads as follows: ''Any liability or liabilities incurred by the Council to be paid in any fiscal year, which singly or in the aggregate shall be in excess of the revenues for such year, shall be null and void.''

The court held that the provision meant that liabilities incurred in a particular year, which exceed the revenues provided for the year in which they are to be paid, are null and void. It was held further that one of the purposes of the people in enacting the particular provision in question was to prevent the Council from incurring obligations payable in a future year while leaving it to future councils to find the money to discharge them. The court limited its decision as to the meaning and effect of the section to cases involving extraordinary expenditures, such as contracts for permanent improvements, and expressly declined to intimate any opinion as to its effect upon contracts for the ordinary running expenses of a city or other municipality.

■ While the limitation upon the powers of the directors in the case at bar is couched in more general terms than the limitation above mentioned, contained in the Portland city charter, we think that it was clearly the intention of the legislature to limit the incurring of

indebtedness without voter approval to the amount of the ordinary net annual income for the particular year in which such indebtedness is incurred. In a businesslike administration of the district's financial affairs, such net income is all that the directors have at their disposal for the retirement of unbudgeted indebtedness. So far as being a basis for the creation of indebtedness is concerned, "income" can only mean net income, as net income is the only available source from which such indebtedness may be discharged. See Opinion of the Justices, 46 Mass. 586, 598. " . . . the revenue bond and the borrowing 'authority' have in recent years grown in popularity. Both are devices which may readily be abused, and constitute a possible threat to sound municipal credit. It is generally believed that self-supporting municipal debt can be disregarded. On the contrary, debt service paid out of municipal utility earnings is as much a charge against the community's income as if it were supported by the general property tax. The 'authority' permits evasion of debt limits and ushers in a new overlapping unit when there are already too many layers of government . . ." Hillhouse, Municipal Bonds, p. 481.

■ The apparent ambiguity in the phrase under discussion should, in our opinion, be resolved by strict construction limiting the authority of the directors to borrow, without prior voter approval, up to but not exceeding the amount of the net income rather than that of the gross income; that is to say, the ambiguity should be resolved in favor of the public and against the corporation.

> "Since municipal powers are required to be conferred in plain unambiguous terms, the general well-settled rule of construction is that a doubtful

power is a power denied. That is, any ambiguity or doubt arising out of the terms employed in the grant of power must be resolved against the corporation and in favor of the public . . ." 1 McQuillin, Municipal Corporations, 2 ed., Rev. vol. 1, section 268.

The second question to be considered is whether or not, without previous voter approval, the district may issue and sell any revenue bonds whatever.

Section 114-256, O. C. L. A., contains, as above noted, the following proviso: "Before any district shall issue any general obligation or any revenue bonds, the question whether such bonds of said district shall be issued shall be submitted to the qualified voters of the district, . . ."

The plaintiff takes the position that the language of such proviso is to be strictly construed and permits of no exceptions. The defendants contend, to the contrary, that strict construction does violence to the People's Utility District law when considered as a whole, and leads to an impractical and unbusinesslike result. The general powers of the corporation are enumerated in section 114-245, O. C. L. A., subdivision 6 of which provides, in part, that the district shall have authority:

"To borrow money and incur indebtedness, subject to the conditions hereinafter provided, to issue, sell and assume evidence of indebtedness, and to refund and retire any indebtedness that may exist against or be assumed by the district or that may exist against the revenues of such district; provided, that no indebtedness shall be incurred by the board of directors exceeding the ordinary annual income and revenue of the district without the approval of the qualified voters, as hereinafter provided for; . . ."

It is argued that this section implements the constitutional amendment (Article XI, section 12) authorizing the creation of people's utility districts, which reads, in part: " . . . Such districts shall have powers: . . .

"(c) To issue, sell and assume evidences of indebtedness."

In other words, the defendants' argument is that the district's power to issue bonds may be implied from its general power to issue, sell and assume evidences of indebtedness, as distinguished from its specific power to issue bonds.

■ The general rule is that the authority of a municipal corporation to issue bonds will not be implied, but must be expressly granted.

"As inherent power to issue does not exist a municipality may issue bonds only when duly empowered. At present it is the law in most of the states and in the Supreme Court of the United States, that municipal corporations have no power to issue bonds unless expressly authorized so to do, or perhaps where there is an absolute necessity therefor to carry out other powers expressly conferred upon the municipality; and the power cannot be implied from the ordinary police powers conferred upon municipalities. However, the earlier cases in the federal courts were to the contrary, and even at present implied power to issue is recognized in some states. Some decisions have held that the express power conferred on a municipality to purchase property or erect buildings carries with it the power to issue bonds for the cost, and that is the law today, it seems, in some states, although the weight of authority and the tendency of the later decisions is to the contrary.

"Likewise, there are early decisions, and in some states it seems to be the law at present, that con-

ferring express power upon a municipality to borrow money includes power to issue bonds to pay for the loan, although the contrary, or at least the rule that the power is not necessarily implied in such a case, is the law in the Supreme Court of the United States and in some of the state courts.'' McQuillin, Municipal Corporations, 2 ed., Rev. vol. 6, section 2437.

See also 1 Jones, Bonds and Bond Securities, 4 ed., sections 45, 48.

■ In *Brenham v. German American Bank,* 144 U. S. 173, the facts were that negotiable bonds had been issued by the city of Brenham, Texas, under the assumed authority of a legislative act incorporating the city, section 2 of which act provided, ''That the city council shall have the power and authority to borrow for general purposes not exceeding ($15,000) fifteen thousand dollars on the credit of said city; . . . '' The action was brought in the Circuit Court of the United States for the Western District of Texas against the city to recover upon coupons cut from the bonds. The city demurred to the petition on the ground that it failed to show any authority in the city to issue the bonds and coupons. The plaintiff had judgment for the amount of the coupons. On writ of error to the Supreme Court of the United States, the judgment was reversed. We quote from the opinion:

''The confining of the power in the present case to a borrowing of money for general purposes on the credit of the city, limits it to the power to borrow money for ordinary governmental purposes, such as are generally carried out with revenues derived from taxation; and the presumption is that the grant of the power was intended to confer the right to borrow money in anticipation of the receipt of revenue taxes, and not to plunge the municipal

corporation into a debt on which interest must be paid at the rate of ten per centum per annum, semi-annually, for at least ten years. It is easy for the legislature to confer upon a municipality, when it is constitutional to do so, the power to issue negotiable bonds; and, under the well-settled rule that any doubt as to the existence of such power ought to be determined against its existence, it ought not to be held to exist in the present case."

In *Hall v. Hood River Irr. Dist.,* 57 Or. 69, 110 P. 405, this court held that it is settled law that municipalities cannot issue bonds unless the authority to do so is expressly given or clearly implied. The defendants herein, conceding that to be the general rule, maintain that their authority to make the proposed bond issue is clearly implied from the provisions of section 114-245, O. C. L. A., which authorize the district to issue and sell evidence of indebtedness and to refund any indebtedness outstanding. This language, it is contended, is descriptive of bonds rather than of warrants, notes or certificates of indebtedness. We are of the opinion, however, that, in the face of the express prohibition against the issuance of any general obligation or revenue bonds without previous voter approval (section 114-256, O. C. L. A.), the authority to issue revenue bonds without such approval may not be clearly implied from the general authority to issue and sell evidence of indebtedness and to refund indebtedness. In *Kruesel v. Collin,* 171 Wash. 200, 17 P. 2d 854, cited by defendants, county commissioners had authorized a bond issue for the purpose of funding a warrant indebtedness incurred for indigent relief. The action was brought to enjoin the issuance of the bonds, on the ground that, under the state law, obligations of the character in question could be met only by the

issuance of warrants, subject to the restrictions imposed by the county budget act. The court held that the duty to care for the indigent was a mandatory duty imposed upon the county by the state, that the performance of such duty was a governmental function, and that, under those circumstances, the power to issue bonds might be implied from the power to borrow money. We quote:

". . . The better rule, we think, is that, where the power to borrow is granted, the power to issue bonds is implied if the borrowing is to enable the county to perform a duty or function imposed upon it by the state. . . ."

It is to be noted, however, that the case is not in point here, as authority for the raising of money for general county purposes in any manner was found by the court in section 5575, Rem. Rev. Stat., which provided as follows: "Each and every organized county of this state . . . is hereby authorized and empowered by and through its board of county commissioners to contract indebtedness for general county purposes *in any manner when they deem it advisable,* not exceeding an amount, together with the existing indebtedness of such county, of one and one-half per centum of the taxable property in such county, to be ascertained by the last assessment for the state and county purposes previous to the incurring of such indebtedness." (Italics ours.)

The necessity for the improvement and extension of the district's electric system is a matter as to which the directors are clothed with considerable authority (see section 114-245, O. C. L. A., as amended by section 2, Ch. 287, Or. L., 1941, and section 1, Ch. 205, Or. L., 1945), but the raising of money by the issuance of bonds is expressly limited to such cases as are authorized by vote of the electors.

The ingenious argument is put forward that the apparent purpose of permitting the directors of a district to borrow money without voter approval was "to provide the District with a residuary borrowing power to be used in case of emergencies or when voter approval of bond issues did not keep pace with extraordinary or unforeseen demands for additions or improvements to the plant". We should have thought rather that the requirement of prior approval by the voters was intended by the legislature to put a brake upon the runaway enthusiasm of directors, who might otherwise be tempted to look upon the ordinary exigencies arising in the operation and development of a district as if they were situations of emergency calling for immediate and drastic action by way of remedy. Whether or not the argument is valid, we note that, in any event, it ignores the reasons for the proposed bond issue, as given by the directors in the ordinance in question, as follows:

". . . it is deemed necessary and advisable to issue and sell Electric Revenue Bonds pursuant to the authority vested in the Directors to issue bonds without the approval of the qualified voters, in order to provide funds for the development of the District's electric system by making betterments, improvements and extensions to such system . . ."

This language would indicate that the "betterments, improvements and extensions" contemplated were incident only to the ordinary development of the utility system, and not that any emergency existed or that voter approval of bond issues had not "kept pace with extraordinary or unforeseen demands for additions or improvements to the plant". We do not hold that the existence of an emergency would have authorized the proposed bond issue. In our opinion, it would not.

■ While it may be true, as the defendants say, that limitation of the operation of section 114-245 (6), O. C. L. A., to other types of indebtedness than bonds may have the effect of compelling the district to pay a higher rate of interest upon its borrowings, than it might have to pay upon an issue of negotiable bonds, that fact, in our opinion, is not a sufficient reason for the assumption that the legislature intended to empower the directors to issue bonds without prior voter approval. The prohibition against issuing either general obligation or revenue bonds without voter approval is so explicit that we believe that it cannot be overcome by anything short of a clear and positive implication to be found in the language of the statute. We find no such implication and, therefore, are of the opinion that, without prior approval of the qualified voters, the district has no power to issue or sell any revenue bonds whatever.

The decree appealed from is affirmed, with costs.

BELT, J., did not participate in this opinion.