**CITY OF JUNEAU et al., Appellants,**

v.

**William E. HIXSON, a resident taxpayer of the City of Juneau, Alaska, Appellee.**

No. 201.

Supreme Court of Alaska.

July 11, 1962.

Rehearing Denied Aug. 13, 1962.

Fred O. Eastaugh of Robertson, Monagle, Eastaugh & Annis, Juneau, for appellant.

Warren C. Christianson, Sitka, for appellees.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

NESBETT, Chief Justice.

The plaintiff-appellee, a resident and taxpayer of Juneau, Alaska, brought this suit to enjoin the City of Juneau, its mayor and councilmen from issuing and selling one million dollars of general obligation bonds of the city.

The bond proposal was contained in a resolution passed by the City Council of Juneau on April 21, 1960. The question in the proposal was whether the city should issue its general obligation bonds in an amount not to exceed one million dollars and use the proceeds to improve and acquire approximately seven acres of land within the city and convey such parts of the land to the State of Alaska from time to time, as the state required additional land for the expansion of its capital site. The stated purpose of the proposal was to provide land without cost to the state as a site for its capital which would be con-

venient in location, adequate in size and practical in operating economy.[1] At a special election held on May 10, 1960, a majority of the qualified electors of the city voting on the proposal, voted in favor of it. On March 2, 1961, the city adopted an ordinance providing for the issuance and sale of one million dollars of general obligation bonds. As security for the redemption of the bonds the ordinance pledged a percentage of the revenue from the city's retail sales tax and in the event of a deficiency of revenue from that source, then from ad valorem taxes upon all the taxable property within the city.

The trial court enjoined the issuance and sale of the bonds on the grounds that the funds realized therefrom were not to be used for: (1) a "public purpose" within the meaning of that term in article IX, section 6 of the Alaska Constitution,[2] and (2) "capital improvements" within the meaning of article IX, section 9 of the Alaska Constitution.[3] In its memorandum decision the trial court recognized that the city had approved a home rule charter which became effective on October 15, 1960, which was after the special election of May 10, 1960, when the bond proposal was approved by the electors, but before approval of the ordinance authorizing the issuance of the bonds on March 2, 1961. The decision held that the constitutional limitations had the same meaning when applied to a home rule city as when applied to a general law

city and operated with equal restraint on both.

We shall decide this case solely on the constitutional question of whether or not the bond issue was for a capital improvement.

The city argues that the contracting of a debt by it to acquire land to donate to the state for its capital is a capital improvement within the meaning of article IX, section 9 because the land would constitute a permanent investment by the residents of the city which would substantially increase the economic worth of the community and directly improve the welfare and prosperity of its residents.

In opposition appellee argues that a capital improvement is a physical improvement or betterment which results in the creation of depreciable physical assets such as sewer systems, water systems, city halls, schools and the like, which are of value to the taxpayer who finances them; that the use of the term envisages that after creation of the capital improvement, title will remain in the financing authority or a full public use of the improvement will accrue to that authority. Appellee emphasizes that the objective of the bond issue is to persuade the state that it would be to its best interests to not move the capital away from Juneau; that the state has not committed itself one way or the other with respect to the city's plan to offer to donate the land; that the city has no power of eminent domain to acquire the land from the various private

1. The proposal in its entirety states:
   "PROPOSAL: Shall the City of Juneau, Alaska, issue its general obligation bonds in an amount not to exceed $1,000,-000.00 and use the proceeds thereof to improve and acquire approximately 7.0 acres of land and structures thereon, located within the City between land now owned by the State of Alaska and in the general area between Main Street and the Juneau Subport and between Second and Fifth Streets, more particularly described on the City's Capitol Site Acquisition Map, and convey such parts of the Same to the State of Alaska from time to time as it requires additional land and space for expansion of the State Capitol Center Site,

   for the purpose of providing without cost to the State of Alaska a site for its Capitol which is convenient in location, adequate in size and practical in operating economy."

2. Article IX, § 6 states: "No tax shall be levied, or appropriation of public money made, or public property transferred, nor shall the public credit be used, except for a public purpose."

3. Article IX, § 9 states: "No debt shall be contracted by any political subdivision of the State, unless authorized for capital improvements by its governing body and ratified by a majority vote of those qualified to vote and voting on the question."

owners for other than its own use; that as soon as the bonds are sold huge interest payments will commence to accrue; that many other contingencies lie in the way of realizing the objective of the bond issue and that even if the objective were realized, the taxpayers of Juneau would have nothing more than they already have.

■ Since the landmark decision of the United States Supreme Court in Mayor and City Council of Nashville v. Ray in 1874 it has been established law that the power to borrow money does not belong to a municipal corporation unless conferred by legislation.[4]

■ Prior to 1936 Alaskan cities did not have the power to incur bonded indebtedness. In that year Congress authorized municipal corporations in the Territory of Alaska to incur bonded indebtedness to "construct, improve, extend, better, repair, reconstruct, or acquire public works of a permanent character * * *." The act provided that "public work shall include but not be limited to streets, bridges, wharves and harbor facilities, sewers and sewage-disposal plants, municipal buildings, schools, libraries, gymnasia and athletic fields, fire houses, and public utilities".[5] The term "capital improvements" does not appear in the act. The incurring of bonded indebtedness was permitted only with respect to "public works of a permanent character". No definition of public works is given, but the act supplies examples of the types of projects considered to be included within the meaning of that term.

Cities in Alaska had been operating under the provisions of this act for twenty years by the time article IX, section 9 of the constitution was adopted. This section prohibited the contracting of a debt by any political subdivision except for "capital improvements".[6] The term "public works" is not mentioned in this section and the term "capital improvements" is not defined. Nor are any examples provided.

The constitution became effective as the basic law of Alaska on January 3, 1959[7] and immediately thereafter the first state legislature passed an act repealing the provisions of Alaska law which had codified the act of Congress just mentioned.[8] This act of the state was titled as relating

---

4. 19 Wall. 468, 475, 477, 86 U.S. 468, 475, 477, 22 L.Ed. 164, 168–169 (1874), also quoted in 2 Antieau, Municipal Corporation Law § 15.00 (1955), wherein the court stated:
    "The power to borrow money * * * does not belong to a municipal corporation as an incident of its creation. To be possessed it must be conferred by legislation, either express or implied. It does not belong, as a mere matter of course, to local governments to raise loans. Such governments are not created for any such purpose.
    "* * * The idea that they have the incidental power to issue an unlimited amount of obligations of such a character as to be irretrievably binding on the people * * * is the growth of a modern misconception of their true object and character. If in the exercise of their important trusts the power to borrow money and to issue bonds or other commercial securities is needed, the Legislature can easily confer it under the proper limitations and restraints, and with proper provisions for future repayment. Without such authority it cannot be legal-

ly exercised. It is too dangerous a power to be exercised by all municipal bodies indiscriminately, managed as they are by persons whose individual responsibility is not at stake."
    Although established by a court that was sharply divided on the issues the doctrine became fundamental in municipal law. See Claiborne County v. Brooks, 111 U.S. 400, 406, 411, 4 S.Ct. 489, 28 L.Ed. 470, 472, 474 (1884); Fullerton v. Central Lincoln People's Utility District, 185 Or. 28, 201 P.2d 524 (1948); 15 McQuillin, Municipal Corporations § 43.19 (3d ed. 1950).

5. Act of May 28, 1936, ch. 467, § 1, 49 Stat. 1388 (48 U.S.C.A. § 44a [1952], § 16–5–1 A.C.L.A.1949).

6. We are not concerned in this case with indebtedness of political subdivisions secured by revenue bonds which is provided for in art. IX, § 11 of the constitution.

7. Exec.Proc. No. 3269, 24 Fed.Reg. 81 (1959), 48 U.S.C.A. preceding § 21 note.

8. S.L.A.1959, ch. 167.

to the issuance of municipal bonds for "public works and capital improvements".[9] It authorized municipal corporations to incur bonded indebtedness with respect to "public works of a permanent character" just as did the original act of Congress and its examples of the type project that constituted public works were identical to those of the original act except that "off-street parking facilities" was added. Although mentioned in the title of the state act, the term "capital improvements" was nowhere used in the text, which referred only to "public works".

In 1960 the state legislature repealed and enacted an amended version of section 1 of the above mentioned act.[10] The amended version omits the term "capital improvements" from the title[11] and employs the term "public works or facilities of a permanent nature". This act authorizes municipal corporations to incur bonded indebtedness with respect to "public works or facilities of a permanent character", lists the same projects considered to be included within the meaning of the term "public works or facilities" as did the 1959 act for "public works of a permanent character" except that there was, added to the list "real property and improvements and facilities thereon for such uses or purposes as are authorized by law".

In employing the term "capital improvements" in the title of its first act the state legislature demonstrated that it was aware of the constitutional limitation with which we are here concerned.[12] It also seems reasonable to assume that the legislature considered the term to be synonymous in meaning with "public works of a per-

manent character" used in the text of the act to describe the authority thereby conferred. This conclusion is based on the fact that no attempt was made in the text of the act to give separate consideration to capital improvements as a purpose for which a municipality could incur bonded indebtedness.

Nothing in the legislative journals sheds any light on the reasoning which motivated the legislature a year later in amending the act to delete "capital improvements" from the title and employ the descriptive phrase "public works or facilities of a permanent nature". However, we can and do assume that the legislature was enacting the legislation to supplement the constitutional provision and did not intend to attempt to substitute a different purpose than that established by "capital improvements" in the constitution. Therefore, for the assistance it lends, we know that the legislature considered "public works or facilities of a permanent nature" to be synonymous with, or at least included within the meaning of "capital improvements".

As far as we are aware, the only jurisdiction that has ever been called upon to define the term "capital improvements" is New Hampshire, where the court said:

"In the absence of any definition of a capital improvement as used in the act the term 'capital improvement' must be taken in its ordinary sense of a permanent improvement or betterment as distinguished from ordinary repair or current maintenance."[13]

The dictionary reveals that the word "capital" has many meanings. The eco-

---

9. The full title states: "Relating to general obligation and revenue bonds issued by municipal corporations and public utility districts for public works and capital improvements; repealing 16–5–1 through 16–5–9 ACLA 1949 and substituting 16–5–1 through 16–5–6 therefor; and providing for an effective date."

10. S.L.A.1960, ch. 185.

11. The title reads: "Relating to general obligation bonds issued by municipal cor-

porations for public works or facilities of a permanent nature; amending Section 16–5–1, ACLA 1949, as amended by Chapter 167, SLA 1959; and providing for an effective date."

12. Article II, § 13 of the constitution provides in part: "* * * The subject of each bill shall be expressed in the title. * * * *"

13. Leavitt v. Town of North Hampton, 98 N.H. 193, 96 A.2d 554 (1953).

nomic definition is, "A stock of accumulated wealth."[14] "Capital assets" is defined as being synonymous with "permanent assets" in its general accounting use.[15] "Permanent assets" are defined as "A resource, such as land, buildings or machinery, or capital stock of another company held for purposes of control".[16]

"Capital", therefore, seems generally to be associated with value represented by real or personal property in some form and with relative permanency. "Improvement" in its broad sense means betterment.

The Constitutional Convention evidenced a clear intent to protect the financial integrity of all political subdivisions. Limiting the purposes for which they could incur indebtedness to capital improvements was one means selected.[17] This limitation was not intended to permit incurring indebtedness to accomplish *all* desirable improvements sponsored by the governing body and approved by the electorate. If this had been the intent, it would have been clearly stated by simply omitting the word "capital".

█ There is nothing in the history of municipal bonding in Alaska, or in the minutes of the Constitutional Convention that causes us to believe that the term "capital improvements" was intended to denote projects radically different than those for which municipalities had been permitted to incur bonded indebtedness in the past. We believe "capital" was used in the sense in which it is associated with assets in the form of real or personal prop-

erty and that it was intended to connote a degree of permanency. We believe that it includes the "public works of a permanent character" such as "streets, bridges, wharves and harbor facilities, sewers and sewage-disposal plants, municipal buildings, schools, libraries, gymnasia and athletic fields, fire houses, and public utilities" as mentioned in the original act of Congress.[18] It includes "off-street parking facilities" and "public works or facilities of a permanent character" as provided in recent acts of the state legislature.[19] We believe that in selecting the term "capital improvements" the convention had in mind that it was including all the projects just mentioned which had historically been associated with municipal bonding, but under a better generic term—one which did not require illustration by actually listing the type projects that were considered to be included within its meaning and stating that the list itself was not exclusive as was done in the original act of Congress.

The convention did more than substitute a new term—it adopted a concept. We believe that it would be unwise for this court to attempt to provide an abstract definition of "capital improvements". We have concluded that it is beyond human ability to permanently circumscribe with mere words at a given point in time, a concept which, though limiting in one aspect, is otherwise intended to provide a broad, permanent and continuing authority for municipalities to finance present as well as unforeseeable future needs.[20]

---

14. Webster's New International Dictionary, p. 397 (2d ed. 1959, Unabridged).

15. Id. p. 398.

16. Id. p. 106.

17. A similar restriction was placed on the state by art. IX, § 8, which states:
    "No state debt shall be contracted unless authorized by law for capital improvements and ratified by a majority of the qualified voters of the State who vote on the question. The State may, as provided by law and without ratification, contract debt for the purpose of repelling invasion, suppressing insurrection, defend-

ing the State in war, meeting natural disasters, or redeeming indebtedness outstanding at the time this constitution becomes effective."

18. See note 5, supra.

19. See notes 8 and 10, supra.

20. Our dilemma in trying to define the concept in this case is similar to that experienced by the Supreme Court of Errors of Connecticut with respect to "public use", where the court said: "A public use defies absolute definition, for it changes with varying conditions of society, new appliances in the sciences,

The trial court was correct in holding that the bond issue herein was not for a capital improvement. Assuming for the moment that the expenditure of the money could accomplish the desired objective, the end product would lack most of the attributes usually associated with the completed public project for which general obligation bonds have been sold. No permanent asset in the form of real or personal property would accrue to the city. The property acquired by the proceeds would be donated to the state. No thing of value would remain the property of the city. No improvement of general use or service to the taxpayers of the city would have been created by the expenditure. No tangible security for the bonded indebtedness would have been created—in fact, the total security would have been reduced by the removal of some seven acres of downtown property from the city's tax rolls.

The city points out that if the main purpose of the expenditure were realized, the site of the capital would remain in Juneau and this would directly improve the welfare and prosperity of the residents. Nothing in the record or arguments supports the assumption that this would happen except to the extent that the size of and activity in the capital increased with the passage of time and the natural growth of the state. Removal of the aura of economic uncertainty that is said to exist because of doubt as to whether the capital will remain in Juneau is also advanced as a purpose of the bond issue. Improving the welfare and prosperity of its residents and eliminating economic insecurity are legitimate laudable purposes, but we do not believe they can be financed on borrowed funds under the circumstances of this case. If accomplished, the purposes would without doubt be improvements, but they would not be capital improvements.

The city argues that unless it takes the initiative and induces the state not to move the capital, it may lose many of the economic advantages it now enjoys. This points up another characteristic of the program which sharply distinguishes it from the usual bonded indebtedness project. The state has not officially expressed any interest in the city's plan. After the bonds were sold and interest on one million dollars commenced to accrue, the state might reject the city's offer. If this happened, the existing problems of the city would become even more aggravated. In addition, the city would have acquired the burden of paying the principal and interest on the debt out of tax rolls reduced by the loss of some seven acres of valuable downtown property. Financial commitment with respect to an economic program the outcome of which is contingent on overcoming substantial legal, business and political obstacles gives the program many of the characteristics of a business or public relations venture.

■ We are reminded that the city's program has been deliberately planned and that the court should not inquire whether the council's action was wise, dictated by the proper motives or would result in economic benefit to the residents. We agree that it is not the function of this court to pass judgment on matters that lie within the legislative discretion of the council. But where a taxpayer of a community questions the constitutionality of the means employed by his council to finance a civic program, this court has the duty to interpret the constitution. We do not pass upon the merits of the city's project. We simply hold that it is not a capital improvement and therefore cannot be financed on borrowed funds.

The city contends that it acquired greater legislative power under article X, section

changing conceptions of the scope and functions of government, and other differing circumstances brought about by an increase in population and new modes of communication and transportation."

Barnes v. City of New Haven, 140 Conn. 8, 98 A.2d 523, 527 (1953). See also Wilmington Parking Authority v. Ranken, 34 Del.Ch. 439, 105 A.2d 614, 619 (1954).

11 of the Alaska Constitution[21] upon becoming a home rule city on October 15, 1960 and that unless there is a specific statutory prohibition of the ordinance authorizing the issuance and sale of the bonds, it should be held to be valid. It is true that the city acquired greater legislative power upon becoming a home rule city, but by the very terms of the constitutional grant of legislative power to a home rule city it was prohibited from exercising legislative powers prohibited by law. Section 9 is found in the "Finance and Taxation" article of the constitution under the marginal title of "Local Debts". The restriction is specifically applicable to "any political subdivision of the State". This unequivocal wording provides a clear answer to the argument that home rule cities operating under a charter adopted under article X of the constitution are not included. The answer is, they are subject to the same limitation with respect to contracting debts as all other political subdivisions of the state.

Article X, section 13 of the constitution gives a local government the power to enter into agreements with any other local government, the state or the United States unless otherwise provided by law or charter.[22] It is contended that under this power the city should be free to choose the means by which it attains a bargaining position with the state which might result in acceptance of the offer made to the state. We agree, so long as the means chosen are not pro-

hibited by law. Here the means chosen are unlawful because they are in violation of the constitutional prohibition against contracting debt except for capital improvements.

Lastly the city contends that the amendment to chapter 185, S.L.A.1960 was made at its specific request;[23] that the addition of the words "real property and improvements and facilities thereon for such uses or purposes as are authorized by law" to the list of projects considered to be included within "public works or facilities of a permanent character", was made to specifically authorize the purpose of the bond issue here in question. We are unable to find such an authorization in the amendment. The added words have been of no assistance in determining whether the bond issue is for a capital improvement because we have been unable to relate them to the facts of this case.

The trial court in its memorandum decision, which constituted findings of fact and conclusions of law, held that the bond issue herein was not for a "public purpose" within the meaning of article IX, section 6 of the constitution.[24] We do not adopt this basis of the trial court's decision. The judgment below is affirmed on the sole basis that the proposed bond issue was not for a "capital improvement" as required by article IX, section 9 of the constitution.

Judgment affirmed.

21. Article X, § 11 of the Alaska Constitution states: "A home rule borough or city may exercise all legislative powers not prohibited by law or by charter."

22. Article X, § 13 of the Alaska Constitution states:
"Agreements, including those for cooperative or joint administration of any functions or powers, may be made by any local government with any other local government, with the State, or with the United States, unless otherwise provided by law or charter. A city may transfer to the borough in which it is located any of its powers or functions unless prohibited by law or charter, and may in like manner revoke the transfer."

23. See note 10 and text of opinion, supra.

24. Quoted in note 2, supra.