Neal WRIGHT, Appellant,

v.

CITY OF PALMER, Municipal Corporation, State of Alaska, Theodore Schmidtke, Mayor, Emilie St. Pierre, City Clerk, and Members of the City Council of the City of Palmer, Appellees.

No. 1192.

Supreme Court of Alaska.

April 27, 1970.

Eric E. Wohlforth, of McGrath & Wohlforth, Anchorage, for appellant.

Burton C. Biss, Anchorage, for appellees.

OPINION

Before DIMOND, Acting Chief Justice, and RABINOWITZ, BONEY, and CONNOR, Justices.

CONNOR, Justice.

This case questions the validity of a general obligation bond issue for the purpose of encouraging industrial development within a municipality. This is a declaratory judgment action in which appellant, in his capacity as a resident of and owner of real and personal property in the City of Palmer, seeks to have declared invalid the issuance of bonds by the city. These bonds were authorized at a special election at which the proposition carried by a vote of 248 in the affirmative and 7 in the negative. The proposition submitted to the voters was as follows:

### PROPOSITION NO. 1

Shall the City of Palmer, Alaska, issue general obligation bonds in an amount not to exceed Four Hundred Fifty Thousand Dollars ($450,000.00) for the following purpose: Under a 20-year improvement program providing for the purchase of a site and the construction of a manufacturing and processing facility within the City of Palmer. All said general obligation bonds shall mature within twenty years from the date of issue and bear interest at a legal rate.

After the proposition was approved by the voters, the city entered into an agreement with Huskey Manufacturing Corporation, a manufacturer or assembler of industrial housing, low-cost residential housing and mobile homes, by which the corporation agreed that it would in the future enter into a lease and occupy the building to be constructed, for a period of not less than 20 years, to keep its raw materials within the city limits in order to render

it subject to personal property taxation, to employ not less than 80% of its personnel from the Palmer area, to maintain training facilities for its employees, and to maintain on-the-job training programs under federal and state auspices. It also agreed, as a condition to entering into a lease, that it would use the public utilities owned by the city, as far as they are available. The company agreed that the paved parking lot adjacent to the building should be available at all reasonable times for public recreational uses. The agreement also provides that the rental shall be fixed in such an amount that the total cost of the project, including the sums necessary to amortize the bonds sold to finance the project, shall be payable over a 20-year period under a reasonably uniform schedule through the term of the lease. In short, the city would procure or make available land and a structure for the use of the lessee, using the bond proceeds to accomplish this end.

This case obviously has been brought for the purpose of testing the validity of the bond issue and to determine whether the bonds are marketable. The record is somewhat one-sided in that all of the evidence was presented by the city, although the witnesses for the city were cross-examined by counsel for appellant. On the other hand, the legal questions have been thoroughly argued and briefed. Unlike the situation in Ault v. Alaska State Mortgage Association, 387 P.2d 698 (Alaska 1963), we do find the record sufficient for determining the legal issues presented in this case.[1] Unlike *Ault,* where a summary judgment was entered, this case went to a trial on

---

1. In Jefferson v. Asplund, 458 P.2d 995, 998 (Alaska 1969), this court held that an actual controversy is a prerequisite to the granting of declaratory relief under the Alaska statute permitting declaratory judgment actions. We further cited with approval the definition of "controversy" found in the opinion by Chief Justice Hughes in Aetna Life Insurance Company of Hartford, Conn. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937):

"A 'controversy' in this sense must be one that is appropriate for judicial determination. * * * A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. * * * The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests." (Citations omitted.)

the merits under the provisions of Rule 57(a), Rules of Civil Procedure.[2]

The testimony and evidence presented show a pattern of serious economic problems which the City of Palmer is seeking to overcome. The City Council in the agreement to lease makes a recital of its findings about the economic plight of the City of Palmer and its environs. The pattern which emerges from the evidence is that over the course of the last several years the economic growth of Palmer has been nil. The Palmer Comprehensive Development Plan of 1967, prepared by the city, discloses a high year-round rate of unemployment. Virtually no manufacturing exists in the City of Palmer. At one time coal mines were operated in the Palmer area, but these have been shut down because Elmendorf Air Force Base and Fort Richardson, the prime consumers of coal, now utilize natural gas for heating and the generation of electricity. The closure of the mines has resulted in a loss of payroll for the Palmer area estimated at something over one million dollars per annum. Lumber processing has ceased in the Palmer area, with a loss of about 20 jobs. Various other business activities have moved out of the Palmer area recently, including the Matanuska Valley Cooperative Association, the Sears & Roebuck store, and other businesses. Palmer has recently been declared a depressed area by the federal government. It is in an effort to combat this declining economy that the city has proposed the issuance of bonds, the erection of a manufacturing building, and its lease to a private corporation. It is estimated that the proposed project, when fully operational, would employ approximately 65 to 110 persons on a full-time basis.

## IS THERE AN UNLAWFUL LENDING OF CREDIT?

It is asserted that the bond issue and plan of action violates AS 37.10.085,[3] which prohibits either the state or a political subdivision to lend its credit for the use of a private corporation, or to borrow money for the use of a private corporation. We note at the outset that the city is not handing money directly to a private

2. "Rule 57. Declaratory Judgments—Judgments by Confession. (a) Declaratory Judgments. The procedure for obtaining a declaratory judgment pursuant to statute shall be in accordance with these rules, and the right to trial by jury may be demanded under the circumstances and in the manner provided in Rules 38 and 39. The existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate. The court may order a speedy hearing of an action for a declaratory judgment and may advance it on the calendar."
   Many actions such as the one in the instant case have been entertained by other state courts.
   "Municipal financing legislation and projects have frequently been questioned in taxpayer suits, on the ground that they violate state constitutional provisions prohibiting the use of public funds or credit for purposes which are not 'public.' Often such suits are brought by industrialists and others who seek prior judicial approval of a project. [Footnotes omitted.] In most cases, the projects and legislation have been upheld. [Newberry v. City of Andalusia, 257 Ala. 49, 57 So.2d 629 (1952); Wayland v. Snapp, [232 Ark. 57], 334 S.W.2d 633 (Ark.1960); Dycke [sic] v. City of London, 288 S.W.2d 648 (1956); Miller v. Police Jury, 226 La. 8, 74 So.2d 394 (1954); City of Frostberg [Frostburg] v. Jenkins, 215 Md. 9, 136 A.2d 852 (1957); Village of Deming v. Hosdreg Co., 62 N.M. 18, 303 P.2d 920 (1956); Holly v. City of Elizabethton, 193 Tenn. 46, 241 S.W.2d 1001 (1951); McConnell v. City of Lebanon, 203 Tenn. 498, 314 S.W.2d 12 (1958). Contra, State v. Town of No. Miami, 59 So.2d 779 (Fla.1952); State ex rel. Beck v. City of New York, 164 Neb. 223, 82 N.W.2d 269 (1957).]" 70 Yale Law J. 789, at 791 and n. 15, "The 'Public Purpose' of Municipal Financing for Industrial Development."

3. "Financial aid to corporations by state or political subdivision. Neither the state nor a political subdivision of the state may (1) make a subscription to the capital stock of a corporation; (2) lend its credit for the use of a corporation; or (3) borrow money for the use of a corporation."

corporation. Nor is it pledging that its credit or taxing powers may be used to make good the indebtedness of a private person in contravention of the Alaska Constitution.[4] It is within the statutory power of a city to make available industrial sites which may be of benefit to the municipality and to lease them on terms which are advantageous to the public welfare of the city. AS 29.10.132(e).[5] Since significant restrictions and controls are retained by the City of Palmer over Huskey Manufacturing Corporation's operations, the bond issue in question is not violative of AS 37.10.085. These controls and restrictions were imposed upon the corporation to insure the effectuation of the public purpose objective of this bond issue. Roe v. Kervick, 42 N.J. 191, 199 A.2d 834 (1964). We think that the question of whether the public credit is being pledged for a private purpose is also comprehended under the broader question of whether a public purpose is served by the bond issue and plan for its expenditure, which is discussed below.

## IS THE PROJECT A CAPITAL IMPROVEMENT?

The contention is made that the indebtedness would violate Article IX, § 9, of the Alaska constitution [6] which requires that such debt can be incurred only for capital improvements. It is argued that in City of Juneau v. Hixson, 373 P.2d 743 (Alaska 1962), this court laid down a strict test of what constitutes a "capital improvement," rendering that term synonymous with "public works of a permanent character." Because an industrial development project is not clearly within that category, it is said that the plan before us must fail.

We do not read the *Hixson* case so narrowly. There we struck down a bond issue because no capital improvement would have resulted from the expenditure of the proceeds. The vice in the *Hixson* case was that raw land would have been acquired with the proceeds and would then have been donated to the State of Alaska as a proposed capitol site. As a result of the plan, the City of Juneau would have been left with no tangible asset in place of the indebtedness. Furthermore, the State of Alaska had entered into no agreement for and had not otherwise shown an interest in the acquisition or use of any capitol site.

■ By contrast, in the case before us the City of Palmer will own a tangible asset. The plan is that the indebtedness shall be retired out of the rental money received over the life of the bond issue. The land and building fulfill the definition of "capital improvements" which was stated in the

4.  Alaska Const., art. IX, § 6:
    "Public Purpose. No tax shall be levied, or appropriation of public money made, or public property transferred, nor shall the public credit be used, except for a public purpose."
    The courts which have upheld bonding projects as a legitimate exercise of power by the political subdivisions have held that a statute which pledges only project revenues does not pledge the public credit, and, therefore does not lend the public credit in aid of anyone. Newberry v. City of Andalusia, 257 Ala. 49, 57 So.2d 629 (1952); Wayland v. Snapp, 232 Ark. 57, 334 S.W.2d 633 (1960); Bennett v. City of Mayfield, 323 S.W.2d 573 (Ky.1959).

5.  "City properties. * * *
    (e) The council, in order to make sites available for new industries which will benefit the muncipality, may likewise acquire, own and hold such sites, including real property, either inside or outside the corporate limits and may sell, lease or dispose of them upon the terms and conditions as it considers advantageous to the civic welfare of the city, to persons who will agree to install, maintain and operate a beneficial new industry. Sites acquired under this paragraph and any right, equity, claim or title acquired by the municipality to real property sold to it for delinquent taxes are not 'property acquired, owned or held for or devoted to a public use' as used herein."

6.  Alaska Const., art. IX, § 9:
    "Local Debts. No debt shall be contracted by any political subdivision of the State, unless authorized for capital improvements by its governing body and ratified by a majority vote of those qualified to vote and voting on the question."

*Hixson* case [7] as being "associated with value represented by real or personal property in some form and with relative permanency." 373 P.2d, at 747. There is here no giving away of the asset. On the contrary, the city's real ownership of the structure should increase as the years of rental payment go by. Even if the tenants should default, the building probably would be susceptible to a number of other beneficial uses. We conclude, therefore, that the bond issue and the plan of expenditure does not violate the capital improvement requirement of our constitution.

## IS THERE A FULFILLMENT OF PUBLIC PURPOSE?

Article IX, § 6, of the Alaska constitution provides that "[n]o tax shall be levied, or appropriation of public money made, or public property transferred, nor shall the public credit be used, except for a public purpose." It is asserted that the bond issue and the plan for its expenditure violates this provision.

In DeArmond v. Alaska State Development Corporation, 376 P.2d 717 (Alaska 1962), this court noted that the term "public purpose" is one of great imprecision. As we said there,

"We believe that it would be a disservice to future generations for this court to attempt to define it. It is a concept which will change as changing conditions create changing public needs. Whether a public purpose is being served must be decided as each case arises and in the light of the particular facts and circumstances of each case." 376 P.2d at 721.

The technique used by most courts is that of looking to the entire factual and governmental context to determine whether a particular plan of action serves a public purpose.[8] In the area of industrial development bond issues, numerous decisions have upheld such plans.[9] There is much criticism which can be leveled against a community using its public borrowing capacity to sponsor or induce the location of private industry within its boundaries. Many of these plans have been attacked on grounds of public policy, but they have been sustained frequently by the courts.[10] It is true that such plans are susceptible to abuse. Municipalities have been known to go bankrupt after having induced an industry to come to them under such a plan.[11] There are dangers that an industry locating in a community may end up dominating the political and economic processes. On the

---

7. In City of Juneau v. Hixson, 373 P.2d 743 (Alaska 1962), this court defined "capital improvement" as follows:

"The trial court was correct in holding that the bond issue herein was not for a capital improvement. Assuming for the moment that the expenditure of the money could accomplish the desired objective, the end product would lack most of the attributes usually associated with the completed public project for which general obligation bonds have been sold. No permanent asset in the form of real or personal property would accrue to the city. The property acquired by the proceeds would be donated to the state. No thing of value would remain the property of the city. No improvement of general use or service to the taxpayers of the city would have been created by the expenditure. No tangible security for the bonded indebtedness would have been created—in fact, the total security would have been reduced by the removal of some seven

acres of downtown property from the city's tax rolls." 373 P.2d, at 748.

8. See Note, "Legal Limitations on Public Inducements to Industrial Location," 59 Colum.L.Rev. 618 (1959).

9. Newberry v. City of Andalusia, 257 Ala. 49, 57 So.2d 629 (1952); Wayland v. Snapp, 232 Ark. 57, 334 S.W.2d 633 (1960); Dyche v. City of London, 288 S.W.2d 648 (Ky.1956).

10. Although courts have split on the validity of revenue bond plans, the weight of authority is in their favor. Pinsky, "State Constitutional Limitations on Public Industrial Financing: An Historical and Economic Approach," 111 U. of Pa.L.Rev. 265, 276 n. 63 (1963).

11. Long-run economic and social changes are ever present sources of financial risk. Population shifts or widespread economic recession may render unworkable fiscal policies that were once considered sound. These risks, however, are inevitable concomitants of public decision making.

other hand, it is recognized that the location of an industry in a particular community may have widespread economic benefits and that these do fulfill the public purpose and the general welfare of the community, broadly conceived. The tendency in most of the modern case law is to broaden the notion of public purpose to include such projects as the one contemplated by the City of Palmer.[12]

In Walker v. Alaska State Mortgage Association, 416 P.2d 245 (Alaska 1966), and in Suber v. Alaska State Bond Committee, 414 P.2d 546 (Alaska 1966), such broad notions of public purpose were applied. As we observed in the *Suber* case,

> "The basic objective of government is to protect and promote the health, safety and general welfare of the people. When a condition of affairs appears in the state which presents a threat to the accomplishment of that objective, the government has the right, and the obligation, to cope with such threat by whatever measures, within constitutional limits, that are necessary or appropriate." 414 P.2d, at 551–552.

■ The role of the courts in matters of this kind is relatively limited. Our function is not to determine whether, as prudent burghers, we might think this plan wise. City of Juneau v. Hixson, supra.

The test which we must apply is whether the plan is so unreasonable as to transgress the limitations of our constitution. If the plan of action were plainly foolhardy, or if it amounted to the pledging of credit or the giving away of assets without any corresponding discernible benefit, we might be persuaded to strike down the plan. But that is not the case here.

■ The benefits from the plan of the City of Palmer may be enjoyed in part by some individuals more than by others. But collective advantages to the community at large can be perceived quite readily. Although the development of industry is not always an unmixed blessing, as it may impose burdens upon other public facilities, it is hard to see how the City of Palmer could be hurt by the location of an industry within its boundaries. Its plight at the moment is that of an eroding economic community. If the city fathers and the voters of the community feel that this plan of action is necessary, it is not for us to retard them. It is within their legislative province to determine whether the advantages outweigh the risks.

Because we think the public purpose of the project has been demonstrated, we find the bond issue valid.

Affirmed.

12. In the cases applying the public purpose doctrine and the public aid limitations to the fields of transportation, recreation, and parking, courts have placed considerable emphasis on the public importance of the project and the urgency of the need for public financing. Pinsky, supra note 10.