objected to the proceedings before the Industrial Accident Board. After an appeal had been made from the award of the Industrial Accident Board, and during the trial of the case, no verified pleading was filed asserting a defect of parties, as required by Article 2010, Revised Civil Statutes; and the question was raised too late in the Court of Civil Appeals. American Employers' Insurance Co. v. Hookfin et al., Tex.Civ.App., 33 S.W.2d 801, writ refused; Consolidated Underwriters v. Lee, Tex.Civ.App., 107 S.W.2d 482, writ dismissed; Security Union Insurance Co. v. Gullett, Tex.Civ.App., 36 S.W.2d 1085, writ dismissed; Associated Employers' Reciprocal v. Brown et al., Tex.Civ.App., 56 S.W.2d 483, writ dismissed; Southern Underwriters v. Wright, Tex.Civ.App., 125 S.W.2d 1079, writ dismissed, correct judgment; Southern Underwriters v. Thomas, Tex.Civ.App., 131 S.W.2d 409, writ dismissed, correct judgment.

■ Garry alleged that he was an employee of Mose Sampson, doing business as Sampson Iron & Supply Company, and made proof that Sampson was engaged in business and carried a policy of workmen's compensation insurance covering Garry as an employee. The record shows that the Insurance Company was given notice that Garry's claim was before the Board, and it made no assertion that it did not carry the compensation insurance. The undisputed evidence shows that it did carry such insurance. Garry appealed from the award of the Industrial Accident Board, and designated Mose Sampson as employer and the Traders & General Insurance Company as insurer. The trial court submitted to the jury certain issues, and the answers of the jury thereto constituted the basis upon which the judgment for Garry was predicated. The Insurance Company did not request the trial court to submit to the jury the issue as to whether or not Mose Sampson was doing business as Sampson Iron & Supply Company. The Insurance Company having failed to request the submission of such defensive issue, it waived the right to complain now of the action of the trial court in not submitting same. Wichita Falls & Oklahoma Ry. Co. et al. v. Pepper, 134 Tex. 360, 135 S.W.2d 79.

The judgments of the trial court and of the Court of Civil Appeals are affirmed.

## HOUSTON BELT & TERMINAL RY. CO. v. CLARK, Secretary of State, et al.
### No. 1834—7538.

Commission of Appeals of Texas, Section B.
Oct. 9, 1940.

Andrews, Kelley, Kurth & Campbell and T. A. Slack, all of Houston, for plaintiff in error.

Gerald C. Mann, Atty. Gen., and John J. McKay, of Austin, for defendants in error.

TAYLOR, Commissioner.

In 1907 the first called session of the 30th legislature, Acts 1st C.S. p. 502, passed an act prescribing franchise taxes to be paid by private, domestic and foreign corporations for the exercise of the privilege of doing business within this state. In 1919 the act was amended by the 36th legislature at its regular session (Acts 1919, p. 100) to meet the defect in the original act in requiring domestic corporations having a permit to do business outside of the state to pay franchise taxes upon its entire authorized capital stock, plus the surplus and undivided profits of such corporation, regardless of the proportion of its business done outside of the state. In 1930 the 41st legislature, at its 5th Called Session, c. 68, again amended the act, art. 7084, R.S.1925, Vernon's Ann.Civ. St. art. 7084. The article as amended, omitting provisions not material here, reads:

"(A) Except as herein provided, every domestic and foreign corporation heretofore or hereafter chartered or authorized to do business in Texas, shall, on or before May 1st of each year, pay in advance to the Secretary of State a franchise tax for the year following, based upon that proportion of the outstanding capital stock, surplus and undivided profits, plus the amount of outstanding bonds, notes and debentures, other than those maturing in less than a year from date of issue, as the gross receipts from its business done in Texas bears to the total gross receipts of the corporation from its entire business, which tax shall be computed at the following rates for each One Thousand Dollars ($1,000.00) or fractional part thereof; One Dollar ($1.00) to One Million Dollars ($1,000,000.00), sixty cents (60¢); in excess of One Million Dollars ($1,000,-000.00), thirty cents (30¢); provided, that such tax shall not be less than Ten Dollars ($10.00) in the case of any corporation, including those without capital stock. * *

"(B) Corporations which are now required by law to pay annually a tax upon intangible assets, corporations owning or operating street railways in or upon the public streets of any town or city, and corporations organized to maintain or owning or operating electric interurban railways, shall be required to hereafter pay a franchise tax equal to one-fifth (⅕) of the franchise tax herein imposed against all other corporations under Section (A) herein.

"(C) Provided, however, that this Act shall not apply to corporations organized as terminal companies not organized for profit,

and having no income from the business done by them.

"(D) Except as provided in preceding Clauses (B) and (C) all public utility corporations, which shall include every such corporation engaged solely in the business of a public utility whose rates or service is regulated, or subject to regulation in whole or in part, by law, shall pay a franchise tax as provided in this Act, except the same shall be based on that proportion of the issued and outstanding capital stock, surplus, and undivided profits, which the gross receipts of the business of said corporation done in this State bears to its total gross receipts, instead of the gross assets; and in lieu of the rate hereinbefore prescribed said tax shall be computed as follows. * * *

"For the purpose of computing the tax of corporations issuing no par stock, such stock shall be taken and considered as being of the value actually received at the time of the issuance thereof; * * *."

As the construction of the act as amended in 1930 is involved, the emergency clause will be set out, which reads: "The fact that the present franchise tax law results in discrimination against corporations having par value stock on the one hand, and those having no-par stock on the other, and *because a tax on the capital stock fails to reach all of the capital on which a corporation does business and therefore fails to distribute evenly the burden of taxation, as where one corporation has a small capital stock with a large capital provided from bonds, while another has a capital stock fairly representing its actual capital,* and for the further reason that an attack is now being made on the validity of the franchise tax on foreign corporations, create an emergency and an imperative public necessity requiring that the constitutional rule that Bills shall be read on three several days in each House be suspended and said rule is hereby suspended and that this Act take effect and be in force from and after its passage and it is so enacted." (Italics ours.) Section 9.

Particular attention is directed to the italicized portion of the emergency clause.

The act was again amended in 1931, 42nd Leg., p. 441, Vernon's Ann.Civ.St. art. 7084, by adding paragraphs (E) and (F), but that amendment has no bearing upon the question involved here.

For the year ending April 30, 1931, and for six successive years thereafter, to April 30, 1937, inclusive, the terminal company

paid its franchise taxes annually in amounts ranging, with little variation, from $363.06 to $369.90, making no contention that it was not within the terms of the act as amended. The secretary of state, in 1937, after having accepted payment of the taxes annually as they accrued for the six years referred to, demanded the payment of additional taxes for each of those years and the payment of the tax for the year beginning April 30, 1937, computed on a basis other than that theretofore used. The terminal company upon receiving notice from the secretary of state advising that the tax as demanded must be paid at once to avoid statutory penalties, filed suit for an injunction against the secretary of state and the attorney general to enjoin them from taking any action to forfeit its right to do business for non-payment of the additional taxes and penalties. The taxes demanded were paid under protest into the treasury of the state and the terminal company filed another suit, including the state treasurer as a party, for recovery of taxes paid into the suspense fund of the state. The two causes were consolidated and tried as one. The trial was before the court without a jury, largely upon stipulated facts.

The trial court filed findings of fact and conclusions of law. A correct summary of the essential findings of fact, with which, as stated by the Court of Civil Appeals, the terminal company does not disagree, is contained in the opinion of the court, which summary is as follows, 122 S.W.2d 356, 357: "Four railroad companies operating in Texas, herein referred to as the tenant lines, incorporated appellant under the laws of Texas in 1905, subscribing and paying for its capital stock of $25,000 in equal parts, for the primary purpose of furnishing themselves convenient joint terminal facilities in and near the city of Houston, and with all rights and powers now conferred by Art. 6549, R.S.1925, and by Chapters 6 and 7 of Title 112, R.S.1925, Vernon's Ann.Civ.St. arts. 6316 et seq., 6341 et seq., relating to railroads. To effectuate its primary purpose, appellant obtained in 1907, a loan of $5,000,000 from Central Trust Company of New York, and secured it by a mortgage lien on all of its properties, the note and mortgage being executed by appellant alone. As a part of the loan agreement and as additional security therefor, each of the tenant lines pledged its capital stock of appellant, with certain default provisions, to secure their agreement to pay in equal parts the annual interest and sinking fund requirements of the loan, which payments were to and have been made by the tenant lines directly to the trust company for the benefit of the appellant terminal company. The stock trust agreement also provided that the trust company shall be entitled to the dividends of appellant's stock, which shall be applied against any payment in arrears due by any tenant line for annual interest or sinking fund due on either the 'Terminal Agreement' or loan, or on the 'Stock Trust Agreement' of the tenant lines. No dividends have ever been paid on this stock. The annual interest and sinking fund payments have been regularly made for thirty years and have reduced the original $5,000,-000 indebtedness of appellant to less than $3,700,000; and such payments will eventually retire the entire indebtedness, which is in accordance with the terms of the contract and in contemplation of the tenant lines and appellant; and which had resulted in decreasing the liabilities of appellant and in increasing its assets to the extent of over $1,300,000 at the time of the trial as found by the trial court; and which amount it found to be profits and especially so when viewed in the light of the agreement between the tenant lines and appellant with regard to payment by the tenant lines of its fixed costs and a part of its operating expenses. That is, in addition to and independently of the agreement of the tenant lines to pay the annual interest and sinking fund requirements to amortize the $5,000,000 indebtedness of appellant, thereby leaving its properties unencumbered, the tenant lines also contracted with appellant to pay in equal parts its fixed cost, taxes, rents, etc., and also a part of its operating expenses. But knowing that under the laws of Texas (now Art. 6445, R.S. 1925) appellant terminal company would be required by the Railroad Commission to perform terminal services for other railroads demanding such services, and to make such charges therefor as might be fixed by the Railroad Commission or by the Interstate Commerce Commission, the tenant lines and appellant agreed that such income from outside railroads would be used by appellant to defray its current operating expenses, and that any remaining deficit for operating expenses would be paid monthly by the tenant lines, *the amount to be paid by each tenant line to be determined on a user basis of the tenant line for the current month.* The annual operating expenses of appellant (exclusive of interest, sinking fund, and other fixed charges) have averaged approximately $1,700,000, and its income from charges

made under order of the Railroad Commission for services to other railroads, such as 'switching, revenues and incidentals, and income from rent,' has averaged approximately $190,000 annually. And each month the tenant lines have paid the deficit operating expenses, each paying its pro rata share ... determined on a user basis." (Italics ours.)

To the foregoing summary is added the further fact that it appears from article II of the charter of the terminal company set out in the stipulation of facts upon which the case was tried, that, *"in addition to the rights conferred by law upon corporations generally,"* the company "shall have and exercise all the rights, powers and privileges conferred upon railroad companies." (Italics ours).

The stipulation contains also a certification by the then secretary of state, that according to the franchise tax reports filed in that office by the terminal company on March 10, 1931, and March 12, 1937, respectively, the company's balance sheets reflect, among other things, that its assets on December 31, 1929, (land, buildings, machinery and equipment, furniture and fixtures) were valued at $6,075,970.25, and on December 31, 1936, at $6,233,873.84. Mr. Eckert, the auditor of the terminal company, testified that the liabilities of the company had been decreased and that its assets had not diminished in proportion.

Attention is directed also to a portion of the testimony of Mr. Batsell, an expert accountant, who had examined the statement of the financial condition of the company as prepared by the company's auditor. The testimony referred to reads: "One of the facts disclosed by the comparative balance sheets is that the company made a profit during the period from December 31, 1929, to December 31, 1936, of $433,578.93. That is determined by comparing the assets owned by the company at December 31, 1929, of $6,655,342.31 with the assets owned by the company December 31, 1936 of $6,688,079.31 or an increase in assets of $52,737.00 * * * over the period from December 31, 1929 to December 31, 1936, a period of seven years; but we also had to look up a change in the liability of the company how much they have showed at the beginning of the period and at the end of the period, which shows they owed $400,841.93 less on December 31, 1936, than they owed at December 31, 1929."

The trial court's conclusions of law read:

"1. I find that the plaintiff is a terminal company within the meaning of Subdivision (C) of Article 7084 of the Revised Statutes of 1925, as amended.

"2. I find that plaintiff was 'organized for profit' within the meaning of Subdivision (C) of Article 7084 of the Revised Statutes of 1925, as amended.

"3. I find that plaintiff, during the taxable years in question has had an 'income from the business done by it' within the meaning of Subdivision (C) of Article 7084 of the Revised Statutes of 1925, as amended."

■ Upon the foregoing findings and conclusions and the stipulation of facts the trial court rendered judgment denying the relief sought by the terminal company, and rendering judgment for the state as set out in its decrees. The Court of Civil Appeals affirmed the judgment. 122 S.W.2d 356.

The company states in its application for writ of error that the sole question before this court is whether, under the facts, it is a terminal company "not organized for profit," and "has no income" from its business, within the meaning of section (C) of article 7084, as amended.

Unless the findings of the trial court are without evidence to support them, its conclusions of law are correct. The stipulation of facts upon which the case was tried and the testimony received in connection therewith disclose that the findings are abundantly supported. In the absence of any qualifying definition of the terms "profit" and "income" used in the exempting statute we cannot escape the conclusion that under the facts stated the terminal company is the recipient of an income and was organized for profit within the meaning of subdivision (C) of the statute as amended, and that it is not such a terminal company as is exempt under its provisions.

Upon final consideration of the record we have concluded that judgments of the courts below are correct and that the writ was improvidently granted. We approve the holdings of the Court of Civil Appeals as stated in its opinion.

It appears that the gist of the reasoning upon which the court predicates its holding upon the question involved is stated in the following excerpts from the opinion:

"The exempting statute (Subdivision (C) does not attempt to define nor limit the

phrases or terms, 'not organized for profit' and 'having no income from the business done by them.' The two key words involved are 'profit' and 'income', and since the act does not define them singly, nor the phrases in which they are used, they must be given the meaning ordinarily attributed to them. * * *

"So considering appellant as a separate corporation, which must be done because it has so incorporated itself, the various amounts which the tenant lines have contracted to pay to it or for its benefit in consideration of the terminal services furnished them by appellant, are not different in the sense that same are profit and income from the business done, from the charges paid to appellant by all other railroads for the use of its terminal facilities and services; and since the sum total of all such revenue or income, less all expenses, is profit, which appellant's charter authorized it to make, it must be held to be 'organized for profit' within the meaning of the term as used in the taxing act. And since such charges and payments to appellant or for its benefit are in consideration of the use of its terminal facilities and services, they constitute as a matter of law 'income from the business done by' it within the meaning of that term as used in the taxing act."

The terminal company contends that the legislature knew when sections (C and D) of article 7084 were enacted that the corporations exempted by the former section were public utilities, because it expressly recognized in the latter section that the former exempted "certain public utility corporations"; and that the legislature knew from "common knowledge" that the exempted corporation necessarily had an income of some kind because all terminal railways were regulated as to rates or service as provided by article 6549, R.S.1925, when sections (C and D) were enacted.

The company argues in effect from the foregoing contentions as a premise that the legislature did "a meaningless act in including section (C) in the article" as an exemption on the basis of having "no income" from its business unless the term, "no income" meant to the legislative mind only such income as may be earned by a "public utility corporation" whose rates and service are regulated by law, which, the company concludes, is, as applied to it under the stipulated facts, "no income" in so far as conducting a business for profit is concerned.

Aside from the assumptions upon which it proceeds, the argument is not convincing, and is beside the questions involved. Assuming (but not deciding because not necessary to a decision of the case) that the terminal company is a "public utility corporation," the stipulated facts do not disclose as a matter of law, and the company failed to establish in the trial court, that the income received by it from its operations as a terminal company did not, in the language of the company's argument, "represent any material profit" in view of the large capital employed in the business.

The contention as to "material profit" is predicated upon the assumption that the income received from the outside lines constitutes its entire profit income.

The assumption is correctly rejected by the Court of Civil Appeals. It points out that the amounts which the tenant lines contracted with the company and the mortgagee that they would pay the company, is in consideration of the terminal services to be furnished by the company; under the company's planned financial structure and operation that it has already reduced the company's indebtedness more than $1,300,000, and that it is implicit in the contract and organization plan that its entire indebtedness will ultimately be completely retired. The testimony of the company's auditor that in his opinion the purpose of the organization of the company was to effect "greater economy and convenience" for the tenant lines is not inconsistent with the conclusion reached by the trial court and the Court of Civil Appeals, as above stated. The reasons for the conclusion are elaborated in that portion of the court's opinion succeeding the above excerpt therefrom (122 S.W.2d pages 358, 359, paragraphs (1) and (2), which portion we refer to and adopt, but in the interest of economy of space do not incorporate herein.

The contention of the terminal company finds complete answer in the opinion of the Court of Civil Appeals, which we approve in its entirety.

■ It is not amiss in this connection to point out that the emergency clause (set out above) of article 7084, as amended in 1930, at the time section (C) was included in the act, is persuasive that it was not the legislative intent to exempt from the payment of the franchise tax imposed, terminal companies such as the present company is found by the trial court to be under the stipulated plan of organization.

378

This is a fact case and in this connection we direct particular attention to, and approve, the concluding paragraph (4, 5) of the Court of Civil Appeals.

The judgment of the Court of Civil Appeals affirming that of the trial court is affirmed.

MOORE, C. J., disqualified and not sitting.

Adopted by the Supreme Court.