O. L. GRAGG, Petitioner,

v.

CAYUGA INDEPENDENT SCHOOL
DISTRICT, Respondent.

No. B–5444.

Supreme Court of Texas.

June 16, 1976.

Rehearing Denied July 21, 1976.

Billy H. Gragg, Bradley R. Reeves, Palestine, for petitioner.

James E. Pritchard, Fort Worth, Elvin E. Tackett, Bedford, for respondent.

DANIEL, Justice.

This is a suit by the school district to collect ad valorem taxes on ranch land owned by O. L. Gragg for the years 1971, 1972 and 1973. Mr. Gragg's defense is that the denial of an agricultural use designation for his land was contrary to law. The trial court rendered judgment in favor of the school district and the Court of Civil Appeals affirmed. 525 S.W.2d 32. We granted the writ to examine apparent differences between holdings in former cases and the manner in which the Court of Civil Appeals arrived at its judgment in this case. Although differing with its opinion in some respects, we arrive at the same result and

affirm the judgment of the Court of Civil Appeals.

The special treatment of the assessment of agricultural lands for ad valorem tax valuation purposes, was effected by legislative resolution in 1965 and approved by popular vote in 1966. This self-enacting constitutional amendment is now Article 8, Sec. 1–d of the Texas Constitution.[1]

The landowner, O. L. Gragg, is a highly successful businessman who resides in Anderson County. One of his several businesses, and the one to which he devotes most of his time, is a ranching operation covering over 22,000 acres of land. About one-third of his ranch land lies within Cayuga Independent School District. Mr. Gragg testified that he spent ten hours a day, seven days a week, in the ranching business. This was not disputed. The trial court found, however, that Mr. Gragg received more income, both gross and net, from other business ventures, occupations, and investments than from his ranching business. Thus, the question is the legal effect of the income he receives from his "eight or twelve other businesses." His sources of income in addition to agriculture include oil and gas operations (including personal working interests, a partnership oil company which he manages, and a partnership drilling company in the control of which he participates), oil and gas royalty, corporate stock sales and dividends, rent from an office building in Houston, and interest from notes and savings accounts.

The findings of the trial court with respect to the income of Mr. Gragg during each of the relevant preceding years were summarized by the Court of Civil Appeals in the following tables:

| | Gross Income | | |
|---|---|---|---|
| | 1970 | 1971 | 1972 |
| Gross Income from Agricultural Operations | $370,659.07 | $299,205.84 | $301,616.24 |
| Gross Income from Business Ventures, Occupations, and Investment of Capital Other than Agricultural Operations | 415,295.28* | 400,670.11* | 674,659.17* |
| Gross Income from All Sources | 788,719.05 | 703,003.17 | 980,856.31 |
| | Net Income | | |
| Net Income from Agricultural Operations | $131,357.14 | $ 79,397.67 | $109,188.64 |
| Net Income from Business Ventures, Occupations, and Investment of Capital, other than Agricultural Operations | 402,038.55 | 391,091.78 | 661,628.83 |
| Net Income from All Sources | 536,160.39 | 473,616.67 | 775,398.37 |

*Items of partnership income from the oil business are reported here as "net" rather than "gross."

---

1. The full text of Article 8, Sec. 1–d follows:

Sec. 1–d. (a) All land owned by natural persons which is designated for agricultural use in accordance with the provisions of this Section shall be assessed for all tax purposes on the consideration of only those factors relative to such agricultural use. "Agricultural use" means the raising of livestock or growing of crops, fruit, flowers, and other products of the soil under natural conditions as a business venture for profit, which business is the primary occupation and source of income of the owner.

Petitioner Gragg did not challenge the substantial accuracy of the findings or the above summaries of his income from the various sources indicated. He does, however, complain of any use of "net" rather than "gross" income in comparing his ranch income with that from other sources. He also asserts error in balancing his agricultural income against the total income received from all other separate business enterprises in arriving at a determination of whether his ranching business is his "primary occupation and source of income." His appeal presents three contentions which are contested by the school district: (1) that the agricultural assessment provision refers to "gross" rather than "net" income; (2) that "primary" occupation and source of income does not require a majority (more than 50%) of one's income to be agricultural so long as it is more than the amount received from any one of several other businesses; and (3) that only other income from other business ventures or occupations should be considered in comparing sources

(b) For each assessment year the owner wishes to qualify his land under provisions of this Section as designated for agricultural use he shall file with the local tax assessor a sworn statement in writing describing the use to which the land is devoted.

(c) Upon receipt of the sworn statement in writing the local tax assessor shall determine whether or not such land qualifies for the designation as to agricultural use as defined herein and in the event it so qualifies he shall designate such land as being for agricultural use and assess the land accordingly.

(d) Such local tax assessor may inspect the land and require such evidence of use and source of income as may be necessary or useful in determining whether or not the agricultural use provision of this article applies.

(e) No land may qualify for the designation provided for in this Act unless for at least three (3) successive years immediately preceding the assessment date the land has been devoted exclusively for agricultural use, or unless the land has been continuously developed for agriculture during such time.

(f) Each year during which the land is designated for agricultural use, the local tax assessor shall note on his records the valuation which would have been made had the land not qualified for such designation under this Section. If designated land is subsequently diverted to a purpose other than that of agricultural use, or is sold, the land shall be subject to an

of income—specifically that dividends and interest from investments should not be considered. Petitioner Gragg also presents constitutional questions which are conditioned upon our answers to one or more of the foregoing questions.

All of the above questions arise from the last phrase of the following sentence in Sec. 1-d(a):

". . . 'Agricultural use' means the raising of livestock or growing of crops, fruit, flowers, and other products of the soil under natural conditions as a business venture for profit, *which business is the primary occupation and source of income of the owner.*" (Emphasis added.)

*Background and Purpose*

The questions can be considered in proper context and perspective by first examining the background and purpose of the constitutional amendment which created the special agricultural use assessment for land "owned by natural persons which is designated for agricultural use . . . ."[2]

additional tax. The additional tax shall equal the difference between taxes paid or payable, hereunder, and the amount of tax payable for the preceding three years had the land been otherwise assessed. Until paid, there shall be a lien for additional taxes and interest on land assessed under the provisions of this Section.

(g) The valuation and assessment of any minerals or subsurface rights to minerals shall not come within the provisions of this Section.

2. The Texas Legislative Council published an analysis of the proposed amendment before it was adopted by the people in 1966, in which it was stated:

"In 1876, when the present constitution was adopted, the state was largely rural and through the years one of the main forces behind constitutional change has been that of increasing urbanization. As the cities have grown, surrounding land areas have increased rapidly in value. Ordinarily, the owners of land on the fringes of urban areas have welcomed the great capital gains arising from the sale of their land. The profits have more than compensated for the higher tax levies. However, a farmer or rancher who continues to look upon his land as a home and a means of livelihood suffers from the high taxes imposed when the city expands toward his property line. This amendment is designed to give him some relief from the

For the first one hundred years of its existence, Texas was largely a rural State. By 1965, increased urbanization had caused increased market values on agricultural lands near metropolitan areas due to industrial expansion, residential subdivisions, and speculative buying. Payment of taxes on market value as required by the Constitution of 1876 was discouraging farmers and ranchers from continuing their agricultural uses and was in some instances forcing sales and loss of both land and personnel from the essential business of producing food and fiber. See the Texas Legislative Council Report cited in note 2 and Report to the 62nd Legislature of the Agricultural Land Assessment Study Committee under H.C.R. 8, 61st Leg., Reg. Session.

The problem is shared by other states. Agricultural assessment aid with assessments based on value for agricultural uses rather than market values, has been extended to farm and ranch lands in 34 states, with proposed legislation pending in at least two other states.[3] Most of the other states do not have the type of bona fide farmer-rancher safeguard that is a part of the Texas enactment, but many require that the land produce a minimum annual gross income.

Only Texas and Alaska appear to consider income of the landowner in determining the land's eligibility for the agricultural assessment. The Alaska statute, enacted in 1974, follows many provisions of the Texas statute, but it is less cumbersome. For instance, its bona fide farmer provision re-quires only that the owner or lessee "must be actively engaged in farming the land, and derive at least 10 percent of his yearly gross income from the farm use land," with a specific exception in the event of a crop failure.[4]

■ It is obvious that the Texas "primary occupation and source of income" requirement was intended to prevent the lower agricultural assessment from being abused by allowing land investors and speculators to reduce their assessments and taxes simply by planting a crop or running livestock on the land. The provision also has the salutary purpose of encouraging not only that agricultural and ranch land be continued in production but that farmers and ranchers remain in the business of such production. So long as it is thus interpreted, we do not believe the classification will encounter the possible constitutional objections conditionally raised by Petitioner Gragg. The provision has been so interpreted in at least two Texas cases, *San Marcos Consolidated Independent School District v. Nance*, 495 S.W.2d 335 (Tex.Civ. App.1973, writ ref. n. r. e., 502 S.W.2d 694, 1974), and *Klitgaard v. Gaines*, 479 S.W.2d 765 (Tex.Civ.App.1972, writ ref. n. r. e.). See also Opinion of the Attorney General of Texas, M–1271, November 28, 1972.

*Gross Income to be Considered*

■ We agree with Petitioner Gragg's contention that the "primary occupation and source of income" provision contemplates "gross" rather than "net" income. It

increasing tax burden which might eventually drive him off his land."
Under arguments stated by the Council in favor of the amendment, it was said:
"Family farming is a wholesome occupation but is often a risky or marginal business. Any extra burden placed on the family farmers threatens to drive thousands off the land and onto the unemployment and welfare rolls. When the city approaches the farm, the tax burden to the farmer often becomes prohibitive. An equitable tax adjustment, such as the one proposed by this amendment will help to preserve the family farm." Legislative Reference Library, Capitol Building, Austin, Texas.

3. An Analysis of Present and Proposed Texas Laws on Use-Value Assessment of Agricultural Land, prepared by Michael Moeller for the Texas Legislative Property Tax Committee, June, 1975. For a discussion of the general problem and varying state solutions, see also Recent Legislation—Ad Valorem Taxation of Agricultural Land in Tennessee, 4 Memphis St.L.Rev. 127 (1973); Property Taxation of Agricultural and Open Space Land, 8 Harvard J.Leg. 158 (1970); and Wershow, Ad Valorem Taxation and Its Relationship to Agricultural Land Tax Problems in Florida, 16 U.Fla.L.Rev. 521 (1964).

4. Alaska Mun.Gov. § 29.53.035 (Supp.1974).

is our duty in construing the Constitution to ascertain and give effect to the plain intent and language of the framers of a constitutional amendment and of the people who adopted it. *Deason v. Orange County Water Control and Imp. Dist., No. 1,* 151 Tex. 29, 244 S.W.2d 981, 984 (1952); *Cramer v. Sheppard,* 140 Tex. 271, 167 S.W.2d 147 (1942). When, as here, certain language is not plain, it is our duty to determine the intent from the other provisions, including the general purpose, of the entire enactment.

In writing and submitting to the electorate Section 1–d of Article 8, the Legislature failed to insert the word "net" or "gross" ahead of the word "income." We are not authorized to supply a missing word for the purpose of clarity, but it is our duty to determine by recognized rules or judicial interpretation whether the Legislature intended the comparison of sources of income to be based upon net or gross income. We have concluded that this determination must be based upon the manner and context within which the term is used. This is because the word "income" is susceptible of various meanings. It has been interpreted by courts to mean "net" or "gross," depending upon the connection in which it is used. In *Words and Phrases,* there are 116 pages of definitions of "income." See 20A *Words and Phrases,* 163–279.

Different editions of the same legal dictionaries carry different definitions of "income," depending upon the cases cited. For instance, the 1933 edition of *Black's Law Dictionary* defined the term as "that which comes in or is received from any investment of capital, without reference to outgoing expenditures; while 'profits' generally means the gain which is made upon any business or investment when both receipts and payments are taken into account . . . ," citing *People v. Niagra County,* 4 Hill (N.Y.) 20, and *Bates v. Porter,* 74 Cal. 224, 15 P. 732. *Black's Law Dictionary* 944 (3rd ed. 1933). The 1968 edition gives a broader definition, including "return in money" and "profits," as follows: "The return in money from one's business, labor, or

capital invested; gains, profits, or private revenue," citing *In re Slocum,* 169 N.Y. 153, 62 N.E. 130 (1901). *Slocum* involved a bequest of "the income of my said estate, after deducting the necessary costs and expenses of investing the property and collecting the income . . . ." See the lower court opinion in the same case, styled *In re Austin's Will,* 60 App.Div. 438, 69 N.Y.S. 1036 (1901).

There have been numerous cases in which the use of the word "income" has been held to mean "net income" because of the circumstances, purposes, and manner of its use, but which recognize that under other circumstances the word should be interpreted to mean gross income." Such a case was *Fullerton v. Central Lincoln People's Utility District,* 185 Or. 28, 201 P.2d 524 (1948), wherein the court said:

"The word 'income' is capable of a variety of meanings, depending upon the manner of its use. The ordinary meaning, without qualification, is as follows: ' "Income" means that which comes into or is received from any business or investment of capital, without reference to the outgoing expenditures. The term, when applied to the affairs of individuals, expresses the same idea that "revenue" does when applied to the affairs of a nation.' 4 Words and Phrases, First Series, page 3504 [20 Words & Phrases, Perm.Ed., p. 492]."

A leading case on the subject in Texas is *Houston Belt & Terminal Ry. Co. v. Clark,* 122 S.W.2d 356 (Tex.Civ.App.1938, affirmed, 135 Tex. 388, 143 S.W.2d 373, 1940), in which the question was whether the railroad company was exempted from payment of a franchise tax under a provision that "this act shall not apply to corporations organized as terminal companies not organized for profit, and having no income from the business done by them." In holding that the company had "income," the court said:

"The term 'income' ordinarily means that 'which comes into or is received by any business or investment of capital,

without reference to the outgoing expenditures.' 4 Words and Phrases, First Series, p. 3504. Income is the 'gain which proceeds from property, labor, or business.' 1 Bouv. Law Dict., Rawle's Third Rev., p. 1527. The statutes use the word 'income' or the phrase, 'income from the business done by them,' in the sense of any income, as distinguished from net income."

In affirming, this Court said:

"The contention of the terminal company finds complete answer in the opinion of the Court of Civil Appeals, which we approve in its entirety."

See also *Humble Oil & Refining Co. v. Calvert*, 478 S.W.2d 926 (Tex.1972); *San Marcos Consolidated Independent School District v. Nance*, 495 S.W.2d 335 (Tex.Civ. App.1973, writ ref. n. r. e.); *Denver Live Stock Comm. Co. v. Comm. of Internal Revenue*, 29 F.2d 543 (8th Cir. 1928); *Crider Bros. Comm. Co. v. Comm. of Internal Revenue*, 45 F.2d 974 (8th Cir. 1931); *In re Knight*, 9 F.Supp. 502 (Conn.D.C.1934); *Opinion of Justices*, 254 Ala. 188, 47 So.2d 729 (1950); *State v. Morgan Gin Co.*, 186 Miss. 66, 189 So. 817 (1939); *Fullerton v. Central People's Utility Dist.*, 185 Or. 28, 201 P.2d 524 (1948); *State ex rel. McKay v. Keller*, 140 Fla. 346, 191 So. 542 (1939); *W. C. Sharp Drug Stores v. Hansard*, 176 Tenn. 595, 144 S.W.2d 777 (1940).

In *San Marcos Consolidated Independent School District v. Nance, supra*, the decision in favor of farmer-rancher taxpayers was based on their *gross* income. Instructions to the jury which were held to be correct by the Court of Civil Appeals included the following:

"You are instructed that the term 'income,' as used in this charge, means that which comes in or is received from any occupation or business venture or investment of capital without reference to the outgoing expenditures."

A similar term in the Federal Bankruptcy Act referring to farmer's income was held to mean gross income in the case of *In re Knight*, 9 F.Supp. 502 (Conn.D.C.1934).

The statute, 11 U.S.C.A. § 203(r) or Bankruptcy Act, § 75(r), provided:

"The term 'farmer' means any individual who is personally bona fide engaged primarily in farming operations or the principal part of whose income is derived from farming operations."

In discussing the meaning of "income," the court said:

"And 'income' I construe to mean 'gross income.' Otherwise, when, by drought or depressed market conditions, the agricultural producer operates at a loss, he would cease to be a farmer entitled to the benefits of the act, if he had any net income from nonfarming operations. Certainly Congress did not intend that such a producer should cease to be a 'farmer' and lose the benefits of the act at the very time when he is most in need."

The purpose of the self-enacting constitutional amendment and the manner in which the term was used in Section 1–d of Article 8 indicate that gross income was to be considered rather than net income. Use of the word "source" contributes to this conclusion. The word "source" as respects matters of taxation has been held to mean origin. *Goldberg v. Gray*, 70 N.D. 663, 297 N.W. 124 (1941). This and other terms of the amendment indicate an interest in the origin of the landowner's gross income to determine whether he is a bona fide farmer or rancher. Since the amendment is self-enacting, it is believed that if net income had been intended, there would have been provisions as to how net income would be determined; whether it would be figured before or after taxes; whether depreciation would be allowed and if so at what rate; as well as other provisions necessary in determining net as opposed to gross income.

Furthermore, the interpretation contended for by the school district would defeat the purpose of the amendment. An almost insurmountable obstacle would be placed in the path of bona fide farmers and ranchers if their qualification under the amendment were to be tested by source of net income rather than gross income. There is a great

difference, especially for those who depend upon the soil for their livelihoods. It is commonly known that farmers and ranchers require large expenditures in their operations and usually receive comparatively larger gross income than net income. Many of such bona fide farmers and ranchers depend upon additional sources of revenue in order to supplement their income from agricultural pursuits.[5]

### Meaning of "Primary" Occupation and Source of Income

For some of the same reasons stated above with respect to the meaning of "income," we agree with Petitioner Gragg that the word "primary" should not be interpreted as requiring the farmer or rancher to receive more than 50% of his total gross income from his farming or ranching business.

The word "primary" has a plain and simple meaning of chief, first, or foremost in degree, quality, or importance or in a list, series or sequence. It is not a synonym for "majority." Available dictionaries seem to agree substantially with Webster's Third New International Dictionary (1967) which defines "primary" as "first in rank or importance; chief, principal," or the additional meaning given in the American College Dictionary (1957), "first in order in any series, sequence, etc."

A similar definition was employed in *San Marcos, supra*, wherein the following instruction of the trial court was approved:

> You are instructed that the term "primary," as used in this charge, means principal; chief; and greater portion of.

It has been specifically held that "primarily engaged in manufacturing" does not mean that a corporation must receive from manufacturing "over fifty percent" of its income in order to qualify for a statutory offset against corporate excise taxes granted to any corporation "which is primarily engaged in manufacturing, processing or assembling materials into finished products . . . ." *Industrial Refrigeration Equipment Co. v. State Tax Commission*, 242 Or. 217, 408 P.2d 937 (1965). In that case manufacturing and assembling constituted 46% of the corporation's four sources of income in 1959 and 30% in 1962. These percentages were not exceeded by revenues from any of the three other categories of activities (rentals, sales, or services). In holding the corporation eligible, the court said:

> We believe that "primarily" means "chiefly" or "principally" but that it does not necessarily mean "over 50 per cent." The Commission contends that in determining the ratio of activities only two factors should be considered—manufacturing and nonmanufacturing—and that Plaintiff is not entitled to the offset as it was not primarily engaged in nonmanufacturing activities. We cannot accept this premise. If the legislature so intended, it could have used the words "over 50 per cent" or similar words describing more than half. It did not. "Primary" can be given its usual meaning without requiring that it be more than 50 per cent.

> We hold that "primarily" as used in ORS 317.070(2) means the largest catego-

<hr />

5. See Report to the 62nd Legislature of the Agricultural Land Assessment Study Committee (H.C.R. 8, 61st Leg., Reg. Session), 6–14. This Committee, in its study of the Agricultural Assessment Amendment after it had been in effect for several years, said that it "feels that the assessor should look to the owner's gross income because it is an easier figure to obtain and does not reflect high operating expenses which diminish a net income." Id. 24. By 1970 the Committee found from questionnaires that only 1,433 applications were made for the agricultural use assessment and 1,053 were approved. Id. 16. Recent figures, however, based upon questionnaires submitted to school districts by the Education Resources Division of the Governor's Office, with 1,000 school districts out of 1,100 reporting, indicate that 11,727 applications for the special agricultural assessments were made in 1975, with only 739 rejections, and a total of 2,459,439 acres qualifying for the special assessments. See Preliminary Report from John H. Poerner, Director, Education Resources Office of the Governor, to the Commissioner of the Texas Education Agency dated April 15, 1976.

ry of several categories, but not necessarily more than 50 per cent of the total volume of business.

■ We hold that a landowner seeking the agricultural use designation and assessment can qualify by discharging his burden of timely showing in a proper administrative or judicial proceeding that his land is designated for agricultural use under the terms of Sec. 1–d of Article 8, including a showing that such use is a business which is his primary occupation and source of income, without showing that his agricultural business occupies more than 50% of his time or accounts for more than 50% of his total gross income for the relevant years. It is sufficient if the landowner shows that he devotes a greater amount of time to his agricultural business than to any other occupations or businesses and that he receives more gross income from his agricultural business than from any other occupation or business. As hereafter shown, Petitioner Gragg failed to carry his burden of proof timely or satisfactorily with reference to his gross income from agriculture as compared to other business ventures.

■ It has been suggested that this interpretation might lead toward the fractionalization of other businesses conducted by a farmer-landowner in order to make his gross receipts from agricultural uses larger than any one of several of his other businesses. Tax assessors are given sufficient authority under the amendment to ferret out and ignore any such artificial arrangements designed to qualify for the special agricultural tax assessment. If a landowner-agriculturalist with a greater gross income from the oil business or any other occupation intentionally divides his business into multiple corporations or partnerships for the purpose of making his agricultural income greater than the gross income of any one of the multiple separate but related business entities, the tax assessors have the authority to deny the application and prevent wrongful use of the agricultural assessment amendment.

### Other Sources of Gross Income Should Include Only Business Occupations, Ventures or Investments

■ Petitioner Gragg contends that only sources of gross income from occupations or business ventures carried on for profit should be compared with gross income from agricultural sources in determining eligibility for the agricultural use designation. This seems to be the clear intent of the agricultural assessment amendment. Only farmers and ranchers who conduct agricultural uses of the soil "as a business venture for profit" are eligible, and then only if such business venture "is the primary occupation and source of income of the owner." It would seem grossly unfair to disqualify a farmer or rancher because of greater receipts from social security, retirement pay, or any other source which was not an occupation or business venture operated for profit. In *Klitgaard, supra,* it was held that proceeds from several sales of land, principal and interest payments on notes given as partial payment for said lands, rentals from inherited commercial property, and oil and gas bonus and delay rentals from unsolicited mineral leases were occasional, isolated, and not part of any business venture. Therefore it was held that none of such receipts comprise the type of income from an occupation which must be balanced against the gross income from agricultural uses. The Court of Civil Appeals held: "Eligibility for benefits of the amendment is not to be determined by the vagaries of nature or the market, nor by fortuitous investment or inheritance."

■ In *San Marcos, supra,* the trial court specifically instructed the jury that it should not consider the receipt by the owner of delay rentals or bonuses from non-producing oil and gas leases on the taxed lands; use of the land for residential purposes; or the receipt by the owner of any annuities, retirement income, pensions, social security payments, or old age assistance. We approve this instruction, because none of these uses or receipts constituted income from occupations or business ventures of the landowners. The non-agricul-

tural sources of income to be considered in determining a landowner's "primary source of income" should be those produced from his activity or business ventures in which he works or gives continuing supervision or attention. In *San Marcos* the jury was charged as follows:

"You are instructed that the term 'income,' as used in this charge, means that which comes in or is received from *any occupation or business venture or investment of capital* without reference to the outgoing expenditures." (Emphasis added.)

■ We approve that construction except with reference to "investment of capital." Income from capital investments should not be considered when the receipts come from the sale of long held assets or as the consequence of an occasional purchase, sale, or investment or loan of funds. The gross income from the investment of capital should be considered only if such investments constitute an occupation or business which requires the management or continuing supervision or attention of the landowner.

■ Under the facts in the present case we approve the trial court's consideration of investment income, because Mr. Gragg did not discharge his burden of proving that such receipts were not returns from related or separate business ventures or occupations.

In both *San Marcos* and *Klitgaard, supra,* it was held that the burden is upon the landowner claiming the agricultural use designation to show the tax assessor, or a court that he is entitled to the designation. Petitioner Gragg wholly failed to attack by appeal or seek injunctive relief from the assessment of his property upon which the school district's suit is based. He sat by and permitted the assessments to be made, the tax rolls to be prepared, and this suit for taxes to be filed against him before challenging the refusal of the tax assessor to give his land the agricultural use designation. The proper procedure would have been to seek an injunction or mandamus requiring the tax assessor to give the agri-

cultural designation as was done in *San Marcos* and *Klitgaard, supra.*

■ Even if the tax assessor had been given all of the evidence on this taxpayer's income that was introduced at the trial, the denial of the agricultural use designation would have been justified. The taxpayer's gross agricultural income during the three calendar years of 1970, 1971 and 1972 (added together), was approximately $1 million, as compared with $1.5 million income from all other sources. He admitted that his income reported from his oil operations was "net" rather than the "gross," which he contended for and reported in connection with his agricultural income. There was simply no proof of his gross income from the oil business. Neither was there any proof that the gross receipts from his oil operations or another business venture did not exceed the gross receipts from his agricultural business.

The record fails to show that the denial of the agricultural use exemption to this taxpayer by the tax assessor was unreasonable, arbitrary or in violation of requirements of the law. The burden fell upon the taxpayer to make that showing, and the trial court and Court of Civil Appeals have correctly held that the taxpayer failed to do so. See *State v. Whittenburg*, 153 Tex. 205, 265 S.W.2d 569 (1954); *State v. Houser*, 138 Tex. 28, 156 S.W.2d 968 (1941).

The judgment of the Court of Civil Appeals is affirmed.

REAVLEY, Justice (concurring).

The Court here writes upon the meaning of the words which require that the agricultural use—of the land being valued for taxation—be "a business venture for profit, which business is the primary occupation and source of income of the owner." I differ with the opinion in two respects: its holding that *gross* income is the basis of comparison of the landowner's occupations, and its holding that each non-agricultural business is to be compared separately with the landowner's total agricultural business.

The agricultural land assessment provision of the Texas Constitution was original-

ly designed in 1965 by the Legislature to permit the lands of farmers and ranchers to be assessed for ad valorem taxation by ignoring true market value and by valuing it as if agriculture were the highest and best use to which the land may be put. See *King v. Real*, 466 S.W.2d 1 (Tex.Civ.App. 1971, writ ref'd n. r. e.). The objectives of that basis of valuation of farm and ranch lands are easily understood and justified. Since 1967 when the taxing officers and boards and the landowners began to apply this Section 1–d, Article 8, of the Constitution, they have faced the problems and restrictions of this requirement that the agricultural use be "a business venture for profit, which business is the primary occupation and source of income of the owner." The Legislature attempted to remove this requirement from the Constitution in 1970,[1] but the proposed change was not adopted in the popular vote.

Before addressing the critical questions of the meaning of "primary  .  .  . source of income" presented in the present case, I must first avow a basic precept: the judicial function is to construe the Constitution and not to rewrite it. The Court is confined to the words and composition of the Constitution as they are—not as we prefer them to be. The task of construing constitutional expressions must first be directed toward deciding—by the consideration of the total language as well as the context of circumstances that aid us in understanding the objectives of that language—an overall rationale of plan and purpose for the constitutional provision. I have several difficulties with the majority opinion. While it tries to simplify the administration of agricultural land assessment, it actually adds complexity and new puzzles. It seems motivated by the desire to enlarge the number of farmers and ranchers who will be entitled to the agricultural use designation of their land, but this

may not be the result—since the predicted effect of basing the determination on gross income seems to me to be no more than the Court's own estimate rather than a product of any evidence of the circumstances of most farmers and ranchers. I should think that the effect of the holding that compares all agricultural income to each separate non-agricultural business will be enjoyed by relatively few landowners. Few of them have so many extra businesses as to profit by this ranking procedure, and those who do operate on a multi-business scale are given the means to acquire an agricultural use designation beyond the intent of the constitutional language. It seems to me that the fundamental flaw of the majority is its failure to base these specific interpretations upon an overall rationale of the constitutional provision and its purpose. I will begin by locating that base as I see it.

The special treatment of Section 1–d was not granted to land investors who might plant a crop or put some livestock on their land. It was not even granted to bona fide ranchers or farmers. Anyone whose ranching operations cover over 22,000 acres of land, and who expends on that operation the time and effort that O. L. Gragg does, is certainly a bona fide rancher. But the Constitution requires more: the agricultural operation must be the *primary* business— as judged both by commitment of effort and receipt of income.

The taxpayer/landowner's occupations and sources of income to be measured are only those which are business ventures, i. e., occupational endeavors to obtain earnings. The taxpayer/landowner's agricultural business must be *the business* which is "the primary occupation and source of income of the owner"—as compared to his non-agricultural business or trade or professional occupation and as measured by the income to him produced by these occupations. The agricultural use designation is to be given

---

1. S.J.R. 15 of the 61st Legislature would have reduced Section 1–d, Article 8, to the following language: "The Legislature shall have the power to provide by law for the establishment of a uniform method of assessment of ranch, farm and forest lands, which shall be based upon the capability of such lands to support the raising of livestock and/or to produce farm and forest crops rather than upon the value of such lands and the crop growing thereon." Acts 61st Leg., R.S.1969, pg. 3227.

only to those whose primary occupation is agricultural rather than non-agricultural. Not only time and activity is to be weighed but also income. The inquiry as to income is but part of the test of the priority of the landowner's occupation. Which occupation is the most important source of his income—agricultural or otherwise? The landowner is not *primarily* a farmer if he operates a dozen businesses and the ten percent of his time and income allocated and collected from his farm exceeds that allocated to and collected from each of the other endeavors. Net profit—the income *to the landowner*—is the indicator of the priority of the source rather than, for example, gross income from the sale of cattle or gross income from occasional trading in mineral leases. The tax assessor and board of equalization are not directed to a consideration of the taxpayer's income during any certain period of time—since casualties or unusual factors may affect profits briefly without changing the priority of the occupation to which the taxpayer/landowner looks for his income.

This is my construction of the constitutional provision. I now turn to my two specific points of dispute with the majority.

### Gross or Net Income

The word "income" usually refers to gain or accretion or return. See *Bowers v. Kerbaugh-Empire Co.*, 271 U.S. 170, 174, 46 S.Ct. 449, 70 L.Ed. 886 (1926); *Humble Oil & Refining Co. v. Calvert*, 478 S.W.2d 926 (Tex.1972); *Fullerton v. Central Lincoln People's Utility Dist.*, 185 Or. 28, 201 P.2d 524 (1948); *Kennard v. Wiggins*, 353 Mo. 681, 183 S.W.2d 870 (1944); *State ex rel. Miller v. State Board of Education*, 56 Idaho 210, 52 P.2d 141 (1935); *Stanton v. Zercher*, 101 Wash. 383, 172 P. 559 (1918); *In re Niland's Estate*, 154 Wis. 514, 143 N.W. 170 (1913); *Bingham v. Long*, 249 Mass. 79, 144 N.E. 77 (1924); *Connecticut General Life Ins. Co. v. Eaton*, 218 F. 188 (D.C.Conn.1914); *In re Owl Drug Co.*, 21 F.Supp. 907 (D.C.Nev.1937); *Lyeth v. Hoey*, 20 F.Supp. 619 (S.D.N.Y.1937); *In re Phillips' Will*, 138 N.J.Eq. 96, 46 A.2d 796 (1946); *Hattiesburg Grocery Co. v. Robert-*

*son*, 126 Miss. 34, 88 So. 4 (1921); Black's Law Dictionary (4th ed. 1951); Ballantine's Law Dictionary (1969); Oran, Law Dictionary for Non-Lawyers (1975); Webster's Third International Dictionary (1968); and Webster's Seventh New Collegiate Dictionary (1967).

I agree that "income" has in some instances been used to mean the inflow without deduction for expenses. Our question then becomes a determination of the manner of use of the term in Section 1–d, Article 8, of the Texas Constitution. It is not the purpose of this provision to prohibit gain or activity; it is a measurement of priority. Occupations are to be ranked according to their fruits or products or consequences for the person. The *gross* income of an occupation is a midway factor, but it is not the ultimate result of the occupation. Since the purpose of the constitutional provision is to test the priority of the taxpayer/landowner's occupations, gross receipts or revenue is not the index; it is the gain or profit realized by the taxpayer/landowner from those occupations. We are directed by the Constitution to determine the *business* which is the *primary source of income of the owner.* Ranching and oil businesses are expected to have gross as well as net income, but the income of the owner from those businesses is his profit.

If O. L. Gragg were asked the amount of *his income* from his ranch business during 1971, would he be likely to give the total gross sales of livestock, etc., by his ranches ($299,205.84), or would he give the income produced for his benefit ($79,397.67)? Would Farmer Brown, who lost his crop and $50,000 last year, tell you that his income from his farm was $60,000 since the latter figure was the amount of his gross income received from the liquidation of his herd of cattle?

The majority seems to think that the determination of the gross income of a business is a simple matter. However, the gross income of a mercantile business is ordinarily considered to be the amount of total sales *less the cost of goods sold.* For the sake of simplicity let us assume that a

farmer is on the cash basis of accounting; under federal tax regulations his "gross income" requires a computation of his *profits* from the sale of livestock or other items which were purchased by him. 1976 Federal Tax Regulations § 1.61–4. The full sales prices and receipts are not his "gross income"; the cost of the purchased livestock must first be deducted. I suggest that the determination of whether the taxpayer/landowner is primarily engaged in agriculture will not entail nearly so many difficult accounting problems as will the rule announced by the majority which requires a comparison of the gross income of each and every business in which the taxpayer/landowner is occupied. If the business is organized as a corporation, limited partnership or business partnership, there will be questions of how to allocate gross income to the taxpayer/landowner. Will it be possible to reduce the "gross income" by incorporating the business or by taking no money except in the form of wages or dividends?

I can find no rational purpose in requiring a comparison of the sources of gross income. If I understand the writing of the majority at this point, the thought is simply that more farmers and ranchers will be entitled to the agricultural use designation if only gross agricultural income is considered. I do not know that this is true, but if it is, I respectfully request that this reasoning be compared to the time honored rule that the courts will construe constitutional and statutory exemptions strictly. *River Oaks Garden Club v. City of Houston*, 370 S.W.2d 851 (Tex.1963); *Morris v. Loan Star Chapt. No. 6, Royal Arch Masons*, 68 Tex. 698, 5 S.W. 519 (1887). Whether or not the agricultural use designation must be termed an "exemption" from taxation, it is favored treatment and the constitutional amendment should not be liberally construed. See *Driscoll Foundation v. Nueces County*, 445 S.W.2d 1, 5 (Tex.Civ.App.1969, writ ref'd, n. r. e., Tex., 450 S.W.2d 320, 1970).

### Meaning of "Primary" Business

The majority is most liberal in allowing the agricultural use designation to the landowner whose agricultural business produces more income than each of his other businesses or occupations—however many the non-agricultural occupations may be and despite the fact that the total non-agricultural income and time requirements may greatly exceed those of the agricultural business. Our first step in this analysis is to decide whether we must lump the agricultural operations together. Why not permit the tax assessor to rank each farm or ranch separately? O. L. Gragg, for example, operates several different ranches. Suppose the taxpayer and his wife operate a field where they grow vegetables, while he and his son have a large cotton farm, he and another son have some chicken houses, and he and a brother operate a large West Texas ranch. Are these separate businesses under the Constitution? I think not. The Constitution provides:

> "Agricultural use" means the raising of livestock or growing of crops, fruit, flowers, and other products of the soil under natural conditions as a business venture for profit, *which business is* . . . .

Any and all "agricultural use" is the one business that must be the taxpayer/landowner's primary occupation.

The next step: "primary." There is no problem as to the meaning of the word. The question is primary *as to what*? I conclude that the objective, as indicated by putting agricultural uses together, is to determine whether agriculture is the primary occupation—as compared to non-agriculture. What would be the purpose of requiring that the farm be more significant than each of a dozen other ventures? This requirement of the Constitution is obviously restrictive. It was no casual bit of drafting; it was intended to prevent the owners of some farms and ranches from obtaining this advantageous assessment of their lands. The comparison that counts—the restriction that ensures that those who obtain the agricultural use designation truly deserve it—is the requirement that the taxpayer/landowner be primarily in the business of agriculture, whatever else (combined) he may do as an occupation.

**874**

If the rule of the majority is to apply, how shall we divide the non-agricultural occupations for purposes of comparison? Do oil and gas operations go together, or is Gragg Drilling Company one entity and Carter-Gragg Oil Company another, etc.? At some point the courts will have to write the rules for arranging these non-agricultural incomes. This could be avoided by following what seems to me to be the plain intent of the Constitution itself. The majority seems to be looking in the direction of that plain intent when it says that the denial of Gragg's agricultural use designation was justified and cites the evidence that his gross agricultural income during the three calendar years of 1970, 1971 and 1972 (together) was approximately $1 million as compared to $1.5 million income from all other sources. I agree that this proof gets to the heart of the case and requires the affirmance of the judgments of the lower courts. The non-agricultural income was all profit or gain, and the gain to Gragg from the agricultural business was necessarily much less than the $1 million (actually about $320,000).

The argument for separation of the non-agricultural income would seem to be that the Constitution points to each "source of income" and thus requires that the taxpayer/landowner receive greater income from agriculture than from any other individual *source*. Gragg Drilling Company and Carter-Gragg Oil Company are two different sources of income, and their income would then be considered separately rather than added together. Gragg owns several different oil properties, and it seems that the production from each of these should be considered as income from a separate source. I conclude that whereas O. L. Gragg may have failed to make the proof required to obtain 1970, 1971 or 1972 agricultural use designations, the record and briefs in this case indicate that he may come within the new rules and be able to make the proof to qualify in future years.

McGEE and JOHNSON, JJ., join in this Concurring Opinion.